[Crim. No. 1354. Third Appellate District.—August 4, 1934.]

THE PEOPLE, Respondent, v. JOHN SEMONE, Appellant.

A. J. Carlson and H. A. Mazzera for Appellant.

U. S. Webb, Attorney-General, and Ralph H. Cowing, Deputy Attorney-General, for Respondent.

THOMPSON, J.—The defendant was charged with the murder of Edward Cornwell. He was convicted of murder of the second degree. From the orders and from the judgment which was accordingly rendered he has appealed.

John Semone leased a vineyard near Modesto upon which he resided with his family. He maintained signs on the property prohibiting hunting and trespassing thereon. December 10, 1933, he overtook and quarreled with two men who were hunting in his vineyard with a dog. Upon ordering them off the premises, one of the men became angry and threatened to shoot him. He fell upon the ground and begged them not to shoot. The affair ended without further demonstration. On the day of the homicide, which was December 16th, the defendant was engaged in cutting willows from an irrigation ditch adjoining his vineyard. He carried with him a pump-gun which he placed on the bank beside the ditch where he was working. He said he took the gun with him hoping to get an opportunity to shoot a jackrabbit which he had seen in that vicinity.

On the morning of the last-mentioned day, the deceased, in company with James Davenport, was engaged in hunting quail on the Bald Eagle Ranch, which belongs to the Bank of America, adjoining the defendant's vineyard. They were hunting at a considerable distance from the point where the defendant was working in the ditch. They fired four or five shots before winging a quail which flew into the vineyard. Following the bird, the hunters ran down between the rows

of vines towards the point where the defendant was engaged in cutting willows. When they reached a point 535 feet from the defendant, he picked up his gun and, without warning, fired directly at them, but failed· to hit them. Cornwell was about three steps ahead of Davenport, who called to the deceased to stop. Davenport testified that he saw the defendant standing in the ditch with about half of his person exposed to view above the bank. He said that he observed him raise the gun immediately after firing the first shot, and pointing it "right at us" he fired again. The gun was loaded with a shell containing a large slug which is ordinarily used for hunting deer. The slug struck Cornwell in the temple just above the eye and killed him. He pitched forward and fell to the ground, where he lay "with blood and brains oozing from the wound". The defendant saw him fall. Picking up his pruning shears he ran towards his house flourishing his gun in one hand and the shears in the other. Davenport observed that his companion was seriously injured and he ran for aid through the vineyard towards the home of his brother-in-law, who lived near by. His course took him towards the ditch from which the defendant had fired the fatal shot. He saw the defendant running away and called to him to stop, saying, "You have killed a man." The defendant indicated that he heard the call, for he waved his gun and shears above his head, but continued to run towards his house. Davenport reached the home of his brother-in-law and promptly telephoned to Modesto for aid. Within half an hour an officer arrived in an automobile. Cornwell was promptly removed to a hospital at Modesto, where he died within a few hours.

The officer went immediately to the home of the defendant, where he found him in company with his two sons and the other members of his family. Upon being asked why he shot Cornwell, the defendant replied, "Why didn't he get off my place when I shot?" The gun with which the deceased had been shot was delivered to the officer, but the cartridges had been removed from the magazine by one of the defendant's sons before the officer arrived. Two cartridges loaded with number five chilled shot were handed to the officer with the claim that they had been taken from the magazine of the pump-gun, and that it contained no cartridges loaded with slugs. The defendant said that he did

not know that any of the cartridges which were used in the gun contained slugs.

At the trial the defendant testified that the hunters with whom he quarreled in his vineyard six days before the homicide occurred were accompanied by a dog which was colored the same and looked like the dog with Cornwell and Davenport at the time of the homicide. He gave the impression that he thought they were the same men with whom he quarreled on the previous occasion. The defendant told a very improbable story of Cornwell and Davenport firing directly at him several times and of the shot falling about him so that he was compelled to raise his arms to protect his head and face from injury. Davenport testified positively that they did not fire their guns while they were in the defendant's vineyard, and upon the contrary, that they only fired at quail four or five times while they were in the adjoining field far beyond a point where it was possible for the shot to reach him. The defendant did testify that he fired his pump-gun into the air and that he did not "intend to kill anybody".

Upon appeal it is contended the verdict and judgment are not supported by the evidence for the reason that there is a lack of proof of malice on the part of the defendant and because the record shows that the homicide was merely the result of an accident; that the court erred in unduly restricting the examination of jurors upon the *voir dire,* and in giving and refusing to give to the jury certain instructions.

The verdict and judgment convicting the defendant of murder of the second degree are adequately supported by the evidence. Mr. Davenport testified that he saw the defendant deliberately point his pump-gun at them when he fired the fatal shot. It is asserted the defendant did not know the cartridge which was fired by him when Cornwell was killed contained a leaden slug. It is claimed that he believed it contained only small bird shot which could inflict no injury to the men at a distance of over 500 feet. However, the cartridge did contain a large slug which killed Cornwell. The cartridges which remained in the magazine of the gun after the fatal shooting were removed before the officer arrived.

The defendant appears to have had a fair and an impartial trial. The serious question in this case is whether the defendant knew, or by the exercise of ordinary care should have known, that the pump-gun was loaded with shells containing leaden slugs, for it is entirely reasonable to assume that if he supposed they were loaded only with small bird shot he could not have anticipated that he would inflict bodily injury upon the men upon whom he fired at a distance of 535 feet. But this was a problem for the determination of the jury under the circumstances of this case. We are of the opinion there is sufficient evidence to support the implied finding that the defendant knew the gun contained shells loaded with slugs at the time he fired the fatal shot. The record shows that the pump-gun was previously used with cartridges loaded with slugs for hunting deer. Six days before the homicide occurred the defendant had a quarrel with two men over hunting on his premises, and he testified that they then threatened to shoot him. There is a conflict of evidence, but the fact that the defendant quarreled with these men over hunting on his premises a few days prior to the homicide; that he assumed Cornwell and Davenport were the same men with whom he had the controversy; that he armed himself with the pump-gun on the day of the homicide; that he deliberately aimed at the hunters as they approached; that he fired at them twice and that the shells which remained in the magazine of the gun were removed after the shooting and before the officer arrived, furnish satisfactory evidence that the shooting was done without provocation or in sudden passion, but rather in an unlawful manner with grave danger of fatally injuring those upon whom the defendant fired, and that he knew the gun was loaded with shells containing slugs. These facts must be deemed to have been determined against the defendant and therefore the jury was warranted in finding him guilty of murder of the second degree.

When an unlawful act which results in death is deliberately performed by an assail nt who knows that his conduct endangers the life of another, and it is executed without provocation or sudden passion, which would reduce the offense to manslaughter, malice is presumed. Under such circumstances the killing constitutes murder of the second degree, when it is not perpetrated by means of

poison, lying in wait, torture or any other kind of wilful, deliberate or premeditated killing. (Sec. 189, Pen. Code; *People* v. *Howard,* 211 Cal. 322, 329 [295 Pac. 333, 71 A. L. R. 1385] ; *People* v. *Hubbard,* 64 Cal. App. 27, 37 [220 Pac. 315] ; 13 Cal. Jur. 603, sec. 18.) While malice may be implied from the commission of an unlawful act under the circumstances above related (sec. 188, Pen. Code; 13 Cal. Jur. 683, sec. 72), the record in the present case contains evidence which justified the jury in assuming that the defendant actually entertained malice toward the individuals upon whom he fired. Six days before the homicide the defendant quarreled with two men over hunting on his premises. When he fired the fatal shot he supposed he was shooting at these same men. In support of the judgment we may assume the jury reasonably concluded the defendant was angry at the conduct of these men and the threat which they made against him on December 10th, and that he took his gun with him for the express purpose of firing upon them or at least with the intention to frighten them with it if they chanced to again return to his vineyard to hunt. We are of the opinion the evidence sufficiently supports the verdict and judgment of murder of the second degree.

The attorney for the defendant was not unduly restricted in his examination of jurors upon the *voir dire.* Upon the examination of Mr. Tatting as a prospective juror, he testified that he had read "about the case" in the "Modesto Bee", but he asserted that he had not discussed the case with the members of his family or with anyone else. He declared that he had neither formed nor expressed an opinion regarding the guilt or innocence of the accused. He said in that regard: "I did not form any opinion about it because that is all I knew, what was in the paper. . . . I have known papers to make mistakes." The attorney for the defendant then attempted to examine the juror upon the details of a very lengthy newspaper article regarding the homicide in question which appeared in the "Modesto Bee", and which article called attention to the fact that the grand jury failed to indict another man by the name of Piiani for the previous shooting of a trespasser in his watermelon patch. The Piiani case had no connection with the case at bar. While the juror admitted that he had read the article referred to and stated that it created no impression on his

mind as to the guilt or innocence of this defendant, an objection to an examination of the juror with respect to the details of that particular article was sustained. It is now contended this ruling of the court constituted prejudicial error for the reason that it unduly restricted the examination of this and other jurors for the purpose of ascertaining, under the provisions of section 1073 of the Penal Code, whether they possessed a state of mind which would prevent them from acting fairly and impartially without bias or prejudice to the substantial rights of either party to the suit. There is no prejudicial error in this ruling. Tatting, the prospective juror, was subsequently excused by the prosecution. He did not serve as a juror in the trial of the case. The peremptory challenges to which the defendant was entitled were not exhausted. The juror admitted that he had read the newspaper article in question and declared that it left no impression on his mind regarding the guilt or innocence of the defendant. He asserted that he could act fairly and impartially upon the evidence which was actually adduced at the trial. The jury was instructed in that regard: "You are instructed to disregard all gossip and rumor and all newspaper accounts of this case which you might have read and all and any information which might have come to you outside of the evidence introduced in this case. You are not only not to allow such gossip and rumor and outside information to influence your own deliberations, but if you have come into possession of any such gossip, rumor or information outside of the evidence you are not to tell your fellow jurors about it or disclose it in the jury room. Confine your deliberations to the evidence introduced and allowed to remain and do not discuss or consider anything else but the evidence in or out of the jury room."

Section 1076 of the Penal Code provides in part: "No person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon public rumor, statements in public journals, circulars, or other literature, or common notoriety; provided, it appear to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such an opinion, act impartially and fairly upon the matters to be submitted to him."

In the present case it affirmatively appears that the juror had neither formed nor expressed an opinion regarding the guilt or innocence of the defendant based upon newspaper articles or otherwise. It does not appear that any similar questions were propounded or that objections thereto were sustained with relation to other jurors who were not excused from service. It does not appear that a wider scope of examination of jurors with respect to the details of particular newspaper articles would have disclosed any actual bias on the part of any of the jurors. ▮ While it is true that a reasonable latitude should be granted by the court in the examination of jurors on their *voir dire* with the object of ascertaining their state of mind with relation to the presence or absence of bias or prejudice, it is not only the privilege but it is also the duty of the court to restrict the examination of jurors within reasonable bounds so as to expedite the trial. There was no abuse of discretion in that regard on the part of the court in the present case.

▮ The defendant assigns as erroneous the giving of instructions numbered 2, 9, 10, 11 and 20. Upon a careful examination of the entire charge which was given we are of the opinion the jury was very fully and fairly instructed upon all the essential elements which are involved in this case and that the charge contains no prejudicial error. It is asserted that instruction number 2 is erroneous and misleading chiefly for the reason that it omits the element of self-defense upon which the defendant relied, and that it contains no adequate definition of the term "due care and circumspection". It is fundamental that the entire ·charge should be construed together, and that error may not be predicated upon the omission from a single instruction of some exception thereto, condition, definition or phrase which is elsewhere properly given in another portion of the charge. (*People* v. *Brittan,* 118 Cal. 409 [50 Pac. 664].) There is no merit in defendant's claim that instruction number 2 omitted the element of self-defense. The primary object of this instruction was to inform the jury that the defendant should be acquitted if they found that, as a reasonable person, he believed that he was in danger of receiving bodily harm at the hands of his assailants and that he fired the fatal shot in defense of his person. Every necessary element of the doctrine of self-defense appears to have been ade-

quately and properly covered. Moreover, in another instruction which was given at the request of the defendant, the jury was instructed that it was only necessary that the evidence should create a reasonable doubt in the minds of the jurors as to whether the defendant acted in self-defense, to entitle him to an acquittal. We are of the opinion the challenged instruction also contains a sufficient definition of the term "due care and circumspection". That instruction contains the following language in that regard:

"The law of self defense is a law of necessity and that necessity may be real or reasonably apparently real. The defendant . . . may act upon appearances, and if the appearances were such as to raise a reasonable apprehension in an ordinarily prudent person of great bodily injury, then the defender will be justified . . . "

The jury was here told in effect that if *acting as a reasonable person* the defendant believed from the circumstances that he was in danger of receiving bodily injury, he would be exercising due care even though he shot and killed his assailant although his assumption subsequently proved to be false. Certainly this instruction was as favorable to the defendant as he was entitled to have given. A court is not required to specifically define every legal phrase that is employed in the giving of an elaborate charge to the jury. There was no harm in adding to the portion of the challenged instruction above quoted, the following language: "Whether they (the circumstances) were real or apparently real is for the jury to decide upon all the circumstances out of which the necessity springs." The jury had just been informed that it did not matter whether the danger to the defendant was real or just "reasonably apparently real". The jury was told that in either event the defendant would be justified in acting upon the appearances, provided he acted as a reasonably prudent man would have acted under similar circumstances. It was therefore harmless and immaterial whether the jury determined that the defendant's fear of harm was real or merely apparently real.

Instructions numbered 9 and 10 are declared to be erroneous because they omit the doctrine of *involuntary manslaughter*. In this assertion the appellant is mistaken. Instruction number 9 fully and correctly charges the jury with respect to the essential elements of both the first and

the second degrees of murder. Instruction number 10 correctly and elaborately charges the jury with respect to both voluntary and involuntary manslaughter, including therein the definition of both offenses in the exact language of section 192 of the Penal Code. These instructions are not susceptible of the construction contended for by the appellant. They are therefore not erroneous.

The giving of instruction number 11 is charged as misleading and erroneous. That instruction covers the principle that one is ordinarily presumed to intend the natural result of his wilful or deliberate act. It then quotes *verbatim* the language of section 1105 of the Penal Code to the effect that upon proof of the commission of a homicide, the burden of establishing circumstances of mitigation, or which justify or excuse the killing, shifts to the defendant. To the language of that section of the code the court added the following well-established rule of evidence: "But such proof need not be by a preponderance of the evidence, but only to an extent sufficient to raise a reasonable doubt in the minds of the jurors as to his guilt *or the mitigating circumstances.*" The italicized clause is all that the defendant challenges as erroneous. We are of the opinion that language constitutes a correct statement of the law. (*People v. Elliott*, 80 Cal. 296, 305 [22 Pac. 207].) Since by the provisions of section 1105, *supra*, the burden shifts to the defendant to establish mitigating circumstances or facts which may justify or excuse the wilful killing of a human being, after the homicide has been proved, and since the rule is well established that an accused is entitled to an acquittal if a reasonable doubt exists as to any necessary element of the crime with which he is charged, it follows that after proof of the commission of a homicide, it is necessary that only sufficient evidence shall be adduced to raise a reasonable doubt of the existence of mitigating circumstances or of facts which will justify or excuse the homicide. That is exactly what the court informed the jury. That instruction is a correct statement of the law.

Instruction number 20 is assigned as erroneous for the reason that it charges the jury that in order to reduce the voluntary killing of a human being which is accomplished "without lawful excuse or justification" to manslaughter, it must appear that it was done in the heat of passion. It is

contended this language omits to instruct the jury that a charge of murder may also be reduced to *involuntary* manslaughter by proof of facts which constitute "an unlawful act not amounting to a felony", or which consist of a "lawful act which might produce death in an unlawful manner, or without due caution and circumspection". There is no merit in this contention. The foregoing instruction was predicated on the assumption that the killing was accomplished "without lawful excuse or justification". It is inferred from the language of section 192 of the Penal Code that if the killing occurs as the result of acts which are performed in the exercise of due caution and circumspection, in the absence of elements which constitute murder of the first or second degree, the homicide is excusable. The same reasoning applies to the other elements constituting involuntary manslaughter. The challenged instruction purports to charge the jury only upon the subject of voluntary manslaughter. The jury was elsewhere instructed regarding the necessary elements of both murder and manslaughter. Both voluntary and involuntary manslaughter were properly defined. The giving of instruction number 20 was therefore not erroneous.

The refusal to give to the jury defendant's instructions numbered 50 and 55 is assigned as erroneous. Defendant's proposed instruction number 50 was fully covered by plaintiff's instruction number 2 which was given to the jury by the court. We are of the opinion the definition of the term "due care and circumspection" which is used in defendant's proposed instruction number 55 was also sufficiently covered by instruction number 2 which was given in the court's charge. There was therefore no error in refusing to give these two instructions to the jury.

The judgment and the orders are affirmed.

Plummer, J., and Pullen, P. J., concurred.