[Civ. No. 32716. First Dist., Div. Two. Sept. 27, 1974.]

RICHARD E. HAWK, Petitioner, v.
THE SUPERIOR COURT OF SOLANO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

[Crim. No. 11545. First Dist., Div. Two. Sept. 27, 1974.]

In re RICHARD E. HAWK on Habeas Corpus.

110

**COUNSEL**

Charles C. Marson, Joseph Remcho, Jeffrey S. Ross, Peter E. Sheehan and Deborah Hinkel for Petitioner.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Chief Assistant Attorneys General, Doris H. Maier, Assistant Attorney General, Arnold O. Overoye and Marjory Winston Parker, Deputy Attorneys General, for Respondent and Real Party in Interest.

**OPINION**

**KANE, Acting P. J.**—In these proceedings by way of habeas corpus and certiorari, petitioner, an attorney, seeks to annul orders of the Solano

Court adjudging him in direct contempt and imposing sentences totaling 54 days in jail and fines totaling $3,200.[1]

The conduct found to be contemptuous occurred in the immediate view and presence of the court between August 14, 1972, and November 10, 1972, during the period petitioner was representing a defendant in a criminal case wherein the defendant was charged with 25 counts of murder.[2]

The power of the court to punish summarily for a direct contempt is contained in Code of Civil Procedure section 1211, which provides: "When a contempt is committed in the immediate view and presence of the court . . . it may be punished summarily; for which an order must be made, reciting the facts as occurring in such immediate view and presence, adjudging that the person proceeded against is thereby guilty of a contempt, and that he be punished as therein prescribed."[3] The orders, which recite facts pertinent to acts committed in the immediate view and presence of the court, establish the jurisdiction of the court to issue the order (*In re Grossman* (1972) 24 Cal.App.3d 624, 631 [101 Cal.Rptr. 176]). Jurisdiction having been established, our responsibility on review of a contempt order " 'is merely to ascertain whether there was sufficient evidence before the trial court to sustain the judgment and order. The power to weigh the evidence rests with the trial court.' [Citations.]" (*In re Buckley* (1973) 10 Cal.3d 237, 247 [110 Cal. Rptr. 121, 514 P.2d 1201].)

We have examined the record with respect to each instance of conduct

---

[1]On February 6, 1973, the date the petitions were filed in this court, we stayed that portion of the trial court's order of February 5, 1973, directing execution of the judgments, pending our determination of the petition for writ of habeas corpus and subject to further order of the court. On June 13, 1973, we issued a further order stating our intention to defer action on the matter until decisions had been rendered in two cases then pending in the California Supreme Court involving similar issues.

[2]Although the judgments of contempt were entered during the course of the trial, after contempt proceedings had been conducted in chambers, the court stayed execution of the judgments pending the discharge of the jury.

[3]A judgment of contempt which is made final and conclusive by section 1222 of the Code of Civil Procedure is not appealable (Code Civ. Proc., § 904.1, subd. (a)(2)), but may be reviewed by certiorari or, where appropriate, by habeas corpus (*In re Buckley* (1973) 10 Cal.3d 237, 259 [110 Cal.Rptr. 121, 514 P.2d 1201]). These proceedings afford petitioner the safeguard of a review of the proceedings below; he is not denied equal protection of the laws because California statutes do not provide for an appeal from or for a stay of an order adjudicating a person in contempt of court (*In re Buckley, supra,* pp. 258-259), nor does he have a right to bail (but see *Bell* v. *Hongisto* (9th Cir. 1974) 501 F.2d 346).

found to be contemptuous in light of the principles enunciated in the *Buckley* case and have reached the following conclusions:[4]

> *Contempt No. 1: Advising his client to*
> *disobey a lawful order of the court.*

The judgment of contempt of court issued *nunc pro tunc* August 14, 1972, states that upon motion of the People an order was duly made directing that the defendant provide exemplars of his handwriting to the People, that contemner acquired knowledge of the order by reason of the fact that the order was audibly pronounced in open court in the presence of the contemner and his client, and that said contemner "wilfully stated to the Court that he had instructed and was instructing his client, JUAN VALLEJO CORONA, not to provide the handwriting exemplars therefore [*sic*] ordered by the Court, and the said JUAN VALLEJO CORONA did in fact refuse to provide the same;"[5]

A lawyer shall not disregard or adivse his client to disregard a standing rule of a tribunal or a ruling of a tribunal made in the course of a proceeding, but he may take appropriate steps in good faith to test the validity of such rule or ruling (Code of Professional Responsibility of the American Bar Association (hereafter CPR of ABA), DR 7-106 (A)).[6] Petitioner had been adjudged in contempt for advising his client to disobey a lawful order of the court on July 17, 1972, and, having been denied appellate relief, had served a 48-hour term of imprisonment (see fn. 4).

---

[4]We need not examine the judgment of contempt of court issued *nunc pro tunc* July 17, 1972. A petition for writ of review of that contempt judgment was summarily denied on July 28, 1972, and no petition for hearing was filed in the Supreme Court. On July 31, 1972, petitioner commenced serving the 48-hour term of imprisonment ordered by the court under the terms of the judgment. The July 17, 1972, judgment of contempt, therefore, is not included within the judge's order of February 5, 1973, which ordered execution of the judgments of contempt. Nor need we examine the judgments of contempt of court entered *nunc pro tunc* November 16, 21, 27, and December 21, 1972, for the court, after ordering petitioner remanded to the custody of the sheriff to serve 54 days in the county jail for contempts Nos. 1 through 14, ordered petitioner purged of the last four contempts and dismissed said judgments.

[5]The court also adjudged defendant Corona in contempt of court for his conduct in refusing to provide the exemplars and imposed a fine of $300, deferring execution thereon.

[6]Rule 1 of the Rules of Professional Conduct of the State Bar of California reads as follows: "The specification in these rules of certain conduct as unprofessional is not to be interpreted as an approval of conduct not specifically mentioned. *In that connection the Code of Professional Responsibility of the American Bar Association should be noted by the members of the State Bar.*" (Italics added.)

■ The order compelling the defendant to produce handwriting exemplars was a lawful order (*Gilbert* v. *California* (1967) 388 U.S. 263, 266-267 [18 L.Ed.2d 1178, 1182-1183, 87 S.Ct. 1951]; *United States* v. *Mara* (1973) 410 U.S. 19 [35 L.Ed.2d 99, 93 S.Ct. 774]; *People* v. *Hess* (1970) 10 Cal.App.3d 1071, 1076-1077 [90 Cal.Rptr. 268, 43 A.L.R.3d 643]; *People* v. *Paine* (1973) 33 Cal.App.3d 1048, 1049 [109 Cal.Rptr. 496]; Witkin, Cal. Evidence (2d ed. 1972 Supp.) pp. 441-442). An attorney who advises his client to violate a lawful order of the court may be held in contempt (*Ex parte Vance* (1891) 88 Cal. 281, 282-283 [26 P. 118]; *McFarland* v. *Superior Court* (1924) 194 Cal. 407, 423 [228 P. 1033]).[7]

A court has power to compel obedience to its orders (Code Civ. Proc., §§ 128, subd. 4, 177, subd. 2), and "To control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter appertaining thereto;" (Code Civ. Proc., § 128, subd. 5). The order adjudging petitioner in contempt states that petitioner wilfully stated to the court that he had instructed and was instructing his client not to provide the handwriting exemplars ordered by the court. Petitioner's conduct in advising his client to violate a lawful order of the court constituted a violation of petitioner's duty to "maintain the respect due to the courts of justice and judicial officers" (Bus. & Prof. Code, § 6068, subd. (b)), as well as an unlawful interference with the proceedings of the court (Code Civ. Proc., § 1209, subds. 3, 8).

*Contempt No. 2: Misconduct during* voir dire
*examination of the jurors.*

■ The judgment of contempt of court entered *nunc pro tunc* September 15, 1972, states that "during the examination of . . . a prospective juror . . . and after repeated admonishment by the Court not to attempt to influence prospective jurors by the interjection of personal opinions or prejudicial comments into the jury selection proceedings RICHARD E. HAWK, attorney for the defendant and contemner herein, did ask the following question: 'Now, he [the prosecutor] made some reference to a psychologist being here, and this man sitting here, his name is Harvey Ross from Los Angeles. He is a psychologist. Do you have any objection to someone coming up from Los Angeles for a couple

---

[7]An attorney who wilfully disobeys or violates an order of the court requiring him to do or forbear an act connected with or in the course of his profession, which he ought in good faith to do or forbear, is also subject to disbarment or suspension (Bus. & Prof. Code, § 6103).

of days free of charge to Mr. Corona to help Mr. Corona select a jury because he believes Mr. Corona is innocent?' "

The court found the contemner's references to the appearance of the psychologist at no cost to the defendant and to the psychologist's belief in the defendant's innocence constituted improper and prejudicial attempts to influence prospective jurors in violation of the professional ethics of contemner as an attorney at law, and an improper interference with the administration of justice and the trial of the case.

It is unprofessional conduct for a lawyer knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury, to offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury (Standard 7.5(b) of the American Bar Association Standards Relating to the Defense Function (hereafter ABA Standards-Defense Function)).[8]

▆▆▆ ▆ ▆ Petitioner contends, however, that "no showing was made that there had been any prior order not to make *the statement in question,* or even any prior order cautioning Mr. Hawk about potentially improper comment."[9] (Italics added.) ▆▆ Petitioner's contention cannot be sustained. The People have provided us with a copy of the court's minute order of September 13, 1972, entered two days before the contempt, which reveals that on that date in chambers the court admonished Mr. Hawk about certain *voir dire* of the prospective jurors and warned him of the possibility of contempt if he persisted along those lines.[10]

---

[8]The term "unprofessional conduct" denotes conduct which it is recommended be made subject to disciplinary sanctions (Standard 1.1(f), ABA Standards-Defense Function). The defense lawyer, in common with all members of the bar, is subject to standards of conduct stated in statutes, rules, decisions of courts, and codes, canons, or other standards of professional conduct (Standard 1.1(c), ABA Standards-Defense Function). It is his duty to know the standards of professional conduct as defined in codes and canons of the legal profession (Standard 1.1(e), ABA Standards-Defense Function).

[9]If a contempt order is based on "words wholly innocuous" (*Gallagher* v. *Municipal Court* (1948) 31 Cal.2d 784, 796 [192 P.2d 905]), or on "language of which is in itself not insolent, contemptuous or disorderly" (*In re Hallinan* (1969) 71 Cal.2d 1179, 1181 [81 Cal.Rptr. 1, 459 P.2d 255]), the judge was required first to warn petitioner before taking disciplinary action against him (*Gallagher* v. *Municipal Court, supra* at p. 797; *In re Hallinan, supra* at p. 1183; *In re Buckley, supra* at p. 250; see also *Eaton* v. *City of Tulsa* (1974) 415 U.S. 697 [39 L.Ed.2d 693, 94 S.Ct. 1228]; but see *DeGeorge* v. *Superior Court* (1974) 40 Cal.App.3d 305, 314-315 [114 Cal. Rptr. 860]).

[10]The transcript of the contempt proceedings held in chambers contains the following statement: "THE COURT: This appears to be one of numerous statements by

An attorney should not assert his *personal belief* in his client's innocence or the justice of his cause (1 Witkin, Cal. Procedure (2d ed.) Attorneys, § 239, p. 250). This rule has been codified (Rule DR 7-106 (C)(4), CPR of ABA). Counsel who asserts the personal belief of *another* in his client's innocence circumvents the rule.

A court has power to restrict examination that is designed for partisan advantage rather than for the elimination of an unqualified juror (*People v. Crowe* (1973) 8 Cal.3d 815, 828 [106 Cal.Rptr. 369, 506 P.2d 193]; *People v. Semone* (1934) 140 Cal.App. 318, 326 [35 P.2d 379]). Petitioner's persistence in interjecting prejudicial comments into the *voir dire* examination, after having been warned by the court to refrain from so doing, constituted a contempt of the authority of the court (Code Civ. Proc., § 1209, subd. 5).[11]

*Contempt No. 3: Misconduct during* voir dire *of the jury.*

■ The judgment of contempt of court issued *nunc pro tunc* September 18, 1972, states that contemner on numerous occasions, while examining prospective jurors, stated and insinuated in certain questions asked by him that the prosecution intended to introduce into evidence photographs of a gruesome or revolting nature depicting deceased human bodies or portions thereof, which photographs contemner did further state and insinuate were not necessary to be introduced in evidence; that he, contemner would attempt to keep such photographs from being admitted into evidence; that the court had repeatedly admonished contemner that such statements and insinuations were improper; yet on September 18, 1972, during the examination of a prospective juror, contemner asked the following question: "Now, understanding what our position is, do you see any reason in the world why you should look at all these gory photographs?"

The court found that the contemner's reference to the necessity of such evidence and its character constituted improper and prejudicial attempts

---

you, Mr. Hawk. : . . . The obvious intent of which would be to inject extraneous matters into the record, to make statements of fact which have an obvious purpose solely to influence the prospective jurors, contains two particularly objectionable aspects. One, the reference to 'free of charge.' And second, that this psychologist 'believes that' your client is innocent. That is obviously so grossly improper as to be shocking."

[11] It is not necessary that a court continually repeat admonishments with respect to misconduct of counsel; the warning, once given, should be sufficient notice that subsequent acts of misconduct in defiance of the warning will constitute a contempt of the authority of the court. (Cf. *DeGeorge* v. *Superior Court, supra,* pp. 314-315.)

to influence prospective jurors, a violation of the professional ethics of contemner as an attorney at law, and an improper interference with the administration of justice and the trial of the case.

For the reasons stated in our discussion of Contempt Number 2, and because the court had the power to restrict the examination of jurors within reasonable bounds, petitioner's persistence in interjecting prejudicial comments into the *voir dire* examination, after having been warned by the court to refrain from so doing, constituted a contempt of the authority of the court (Code Civ. Proc., § 1209, subd. 5).

*Contempt No. 4: Misconduct during*
voir dire *of the jury.*

■ The judgment of contempt of court issued *nunc pro tunc* September 20, 1972, states that following the examination of a prospective juror, and after the prosecution had peremptorily challenged another prospective juror, and after repeated admonishments not to attempt to influence prospective jurors by the interjection of prejudicial comments into the jury selection proceedings, petitioner made the following statement: "Your Honor, for the record, I want to say that they passed that woman one time and now they exercise their peremptory challenge; and to me that's an act of absolute white racism. I would like the record to show that the District Attorney is trying to systematically exclude minority groups. He excluded Mrs. Bailey because her husband is black; and now he excludes Mrs. Jackson, who is black also. I think it is improper."

The court found that the contemner's references to white racism and systematic exclusion of minority groups from the jury constituted improper and prejudicial attempts to influence prospective jurors, a violation of the professional ethics of contemner as an attorney at law, and an improper interference with the administration of justice and the trial of the case.

Although *jurors* may properly be interrogated upon the subject of racial prejudice (*Ham* v. *South Carolina*, 409 U.S. 524 [35 L.Ed.2d 46, 93 S.Ct. 848]), petitioner's reference to the prosecution's lawful exercise of a peremptory challenge as an "act of absolute white racism," after repeated admonishments by the court not to attempt to influence prospective jurors by the interjection of prejudicial comments into the jury

selection proceedings, constituted a contempt of the authority of the court (Code Civ. Proc., § 1209, subd. 5).[12]

*Contempt No. 5: Referring in his opening statement to two heart attacks suffered by the defendant "as the result of his arrest and incarceration."*

The judgment of contempt of court issued *nunc pro tunc* October 3, 1972, shows that contemner, on numerous occasions, while examining prospective jurors, insinuated in certain questions asked by him that the defendant had been treated improperly and unfairly by the officers who arrested him; that the court had repeatedly admonished contemner that said statements and insinuations were improper; that, nevertheless, in his opening statement for defendant, contemner did state "I would expect the county doctor to testify that Juan Corona suffered two heart attacks as the result of his arrest and incarceration."

The court found that contemner's reference to the heart attacks was an effort to create sympathy in the minds of the jury for defendant and to create a prejudice against the prosecution, and that the reference constituted an improper and prejudicial attempt to influence the jurors at the trial of the action.

In his opening statement a lawyer should confine his remarks to a brief statement of the issues in the case and evidence he intends to offer which he believes in good faith will be available and admissible. It is unprofessional conduct to allude to any evidence unless there is a good faith and reasonable basis for believing such evidence will be tendered and admitted in evidence (Standard 7.4 ABA Standards-Defense Function).

At the contempt proceedings in chambers, petitioner related to the court that he expected to introduce medical testimony that the defendant had suffered a heart attack "as a result of the accusation, being incarcerated—at least there will be medical evidence before the jury that a man who suffers a heart attack from being in custody would certainly have suffered a heart attack from digging 25 graves. . . ."

---

[12]In the contempt proceedings held in chambers, petitioner justified his conduct as a matter of making a record of systematic exclusion of minority groups. The following colloquy occurred: "THE COURT: In any event, the accusation, I believe, is, you used the word 'white racism.' I don't know what all you said. MR. HAWK: That is the way I put it. THE COURT: It went way beyond anything necessary to protect any record in this case. It is just another inflammatory remark. The Court finds you in contempt, Mr. Hawk."

It appears to us that petitioner was referring to evidence which he believed in good faith would be available and admissible, and thus we find it difficult to adopt the court's characterization of the statement as an "insinuation that the officers who arrested the defendant had treated him improperly and unfairly," made in defiance of an admonition that such insinuations were improper. We conclude, therefore, that the evidence does not support this charge of contempt and that the judgment of contempt in this instance must be annulled.

*Contempt No. 6: Referring to his client by his first name and making reference to his friendship for his client.*

■ The judgment of contempt of court issued *nunc pro tunc* October 3, 1972, shows that contemner, while examining prospective jurors, on numerous occasions referred to the defendant by his first name and on various occasions referred to his friendship for his client; that by such references contemner intended to, and did, imply to the jury that he vouched for the character of his client; that the court repeatedly admonished contemner that said appellation and references were improper; that, nevertheless, while making the defendant's opening statement to the jury, contemner referred to his client as "Juan" and engaged in the following colloquy: "MR. HAWK: Okay. Let me tell you about the man that I smuggled cupcakes into his cell up in Yuba City on his birthday in February of 1971 contrary to the Sheriff's office regulations about bringing in foodstuffs, which I did anyway. THE COURT: Mark the record for me, please, Mr. Reporter. MR. HAWK: Let me tell you about Juan, the Christian. MR. WILLIAMS . . .: Objection. . . ."

The court found that contemner's continual references to his friendship and affection for the defendant constituted improper and prejudicial attempts to influence the jurors, a violation of the professional ethics of contemner as an attorney at law, and an improper interference with the administration of justice in the trial of the case.[13]

---

[13]At the contempt proceeding in chambers, the following occurred: "THE COURT: What does that possibly have to do with any opening statement? It is contemptuous, far out of line. It is ridiculous. MR. HAWK: I apologize for it. I don't know whether the Court believes me, but I do have an affection for Juan Corona, but it was not the thing to say in an opening statement. THE COURT: The Court finds you in contempt. Five days in the County Jail. This is outrageous. You persist in this sort of conduct and you talk about your affection for Mr. Corona. In this opening statement you alluded to your friendship which I admonished you before about. It is not proper. All you are intending to do by this, regardless of what your personal feelings may be, it insinuates that you are vouching for your client's credibility and it is not a professional way to do it. It is clearly improper. . . ."

As an officer of the court the lawyer should support the authority of the court and the dignity of the trial courtroom by strict adherence to the rules of decorum and by manifesting an attitude of professional respect toward the judge, opposing counsel, witnesses and jurors (Standard 7.1(a), ABA Standards-Defense Function).

A court has authority to control courtroom conduct of an attorney that is in flagrant disregard of elementary standards of proper conduct and to temper his speech in order "to insure that courts of law accomplish that for which they were created—dispensing justice in a reasonable, efficient and fair manner." (*In re Buckley, supra,* pp. 253, 254, fns. 21, 22). The record discloses that petitioner stubbornly defied the court's order to refrain from calling his client by his first name and from making references to his friendship for his client.[14] Petitioner's conduct, following numerous warnings, constituted a contempt of the authority of the court (Code Civ. Proc., § 1209, subd. 5).[15]

*Contempt No. 7: Stating before the jury that the defendant "was stripped of his presumption of innocence by the press with the help of the Sheriff's Office."*

▆▆▆ The judgment of contempt of court entered *nunc pro tunc* October 3, 1972, shows that contemner had been admonished on numerous occasions that certain of his statements and insinuations about the Sutter County Sheriff's office were improper; that, nevertheless, in his opening statement on behalf of defendant, contemner made the following statement: " 'Under oath it was alleged by one of the officers of the Sutter County Sheriff's Office, on which search warrants were had, and infor-

---

[14]In chambers, during *voir dire* of the jurors, the court issued the following warning: "I want to warn you for the last time, that one other subtle insinuation which you are continuing to persist in, and that is your continuing to vouch for Mr. Corona by reference to your friendship for him. If that slips out once more you will be back for sentence for the same thing."

[15]It has been held that in instances of direct contempt an apology to the judge should be given serious consideration (*In re Buckley, supra,* 10 Cal.3d 237, 257). "A judge should bear in mind that he is engaged, not so much in vindicating his own character, as in promoting the respect due to the administration of the laws; and this consideration should induce him to receive as satisfactory any reasonable apology for an offender's conduct" (*People* v. *Turner* (1850) 1 Cal. 152, 153). The effect to be given to such a mitigating factor, however, lies exclusively in the sound discretion of the judge (*In re Buckley, supra,* p. 257; *Lyons* v. *Superior Court* (1955) 43 Cal.2d 755, 763 [278 P.2d 681]; *City of Vernon* v. *Superior Court* (1952) 38 Cal.2d 509, 520 [241 P.2d 243]; *In re Friday* (1934) 138 Cal.App. 660, 664 [32 P.2d 1117]). It seems apparent from the colloquy set forth in footnote 13, *ante,* that the judge could not accept the apology as satisfactory in view of the prior admonishment. Consequently, it cannot be said that the trial judge abused his discretion.

mation which was passed out to the press, where Mr. Corona was stripped of his presumption of innocence by the press with the help of the Sheriff's Office.' "

The court found the references to be improper and prejudicial attempts to influence jurors, a violation of the professional ethics of contemner as an attorney at law, and an improper interference with the administration of justice and the trial of the case.

As we have noted, it is unprofessional conduct for a lawyer knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury to make impermissible comments in the presence of the judge or jury.

Petitioner's statement that the defendant "was stripped of his presumption of innocence by the press with the help of the Sheriff's Office," after having been admonished that such statements and insinuations were improper, constituted a contempt of the authority of the court (Code Civ. Proc., § 1209, subd. 5).

*Contempt No. 8: Making reference in his opening statement to his friendship with Judge Richard Arnason.*

■■■ The judgment of contempt of court issued *nunc pro tunc* October 5, 1972, states that contemner, while making the defendant's opening statement, made the following statement: " 'It is something that I got from Richard Arnason who was a judge in Martinez. You may recall this, as he was the presiding judge in the Angela Davis trial. He is an old friend of mine.' "

The judge found that contemner, by said reference, intended to, and did, imply to the jury that Judge Richard Arnason did vouch for the character and integrity of contemner, and that the statement constituted contemptuous and insolent behavior and prejudicial misconduct on the part of the contemner.

We have concluded that this judgment of contempt must be annulled. The language used was wholly innocuous and did not constitute contemptuous and insolent behavior toward Judge Patton, the judge conducting the trial, within the meaning of Code of Civil Procedure section 1209, subdivision 1. Further, the order of contempt contains no *finding* that petitioner disobeyed any previous court order or warning with respect to such conduct, so as to constitute contempt under subdivision 5 of

section 1209 (*In re Hallinan* (1969) 71 Cal.2d 1179, 1184 [81 Cal.Rptr. 1, 459 P.2d 255]; *In re Buckley, supra,* p. 250).[16]

*Contempt No. 9: Humiliation of a witness.*

■ The judgment of contempt of court issued *nunc pro tunc* October 5, 1972, shows that on that date petitioner, after having been admonished to refrain from interjecting into his examination statements, comments and observations, while cross-examining a prosecution witness engaged in the following colloquy: "MR. HAWK: 'Have you ever done any flying'? [THE WITNESS]: 'No.' MR. HAWK: 'I recommend that you don't.' "

The court found that the question and statement, each of which referred to the witness's alleged inability to determine directions on an exhibit at the trial, constituted contemptuous and insolent behavior and prejudicial misconduct on the part of the contemner.

A court·has a duty to exercise reasonable control over the mode of interrogation of a witness (Evid. Code, § 765). The interrogation of all witnesses should be conducted fairly, objectively and with due regard for the dignity and legitimate privacy of the witness, and without seeking to intimidate or humiliate the witness unnecessarily. Proper cross-examination can be conducted without violating rules of decorum (Standard 7.6(a), ABA Standards-Defense Function).

Petitioner's conduct toward the witness did not constitute legitimate cross-examination and justified the interposition of the court (*People* v. *Durrant* (1897) 116 Cal. 179, 212 [48 P. 75]; Evid. Code, § 765; DR 7-106(C)(2), CPR of ABA). Considered in connection with all the surrounding circumstances (*In re Buckley, supra,* p. 250, fn. 16), and following a prior warning, petitioner's conduct in cross-examining this witness constituted a contempt of the authority of the court (*In re Hallinan, supra* at pp. 1184-1185; Code Civ. Proc., § 1209, subd. 5).

---

[16]For the guidance of the trial bench we point out that in case of direct contempt, the order adjudging a person guilty must be stated with sufficient particularity, description and detail to show without aid of speculation or reference to any extrinsic document that a contempt actually occurred. (*Raiden* v. *Superior Court* (1949) 34 Cal.2d 83, 86 [206 P.2d 1081].)

The judge, therefore, must draw the order with meticulous care and should not delegate the draftsmanship to counsel or depend upon the clerk, no matter how experienced, to incorporate it into the minutes.

*Contempt No. 10: Repeating questions after an objection had been sustained.*

■ The judgment of contempt of court issued *nunc pro tunc* October 5, 1972, shows that contemner on numerous occasions, while examining witnesses, persisted in repeating questions as to a certain subject of inquiry after the court had sustained objections thereto; that the court had admonished contemner not to repeat questions to which the court had sustained an objection; nevertheless, that on October 5, 1972, while examining a prosecution witness, contemner "persisted, over objections by the prosecution, in asking questions about certain tire tracks, after objections to such questions had been sustained . . . ."

The court found that the contemner's continual and repetitive questions constituted improper and prejudicial attempts to influence jurors, a violation of the professional ethics of contemner as an attorney at law, and an improper interference with the administration of justice and the trial of the case.

Although our adversary system is built upon the belief that truth will best be served if defense counsel is given the maximum possible leeway to urge in a respectful but nonetheless determined manner, the questions, objections, or argument he deems necessary to the defendant's case (*Smith* v. *Superior Court* (1968) 68 Cal.2d 547, 560 [68 Cal.Rptr. 1, 440 P.2d 65]; *In re Buckley, supra,* p. 249), an attorney, as an officer of the court, owes a duty of respect for the court as well as fidelity to his client (*People* v. *Massey* (1955) 137 Cal.App.2d 623, 626 [290 P.2d 906]; Bus. & Prof. Code, § 6068, subd. (b); 1 Witkin, Cal. Procedure (2d ed.) Attorneys, § 2, p. 11; Standard 7.1 (a), ABA Standards-Defense Function). The duty of a lawyer, both to his client and to the legal system, is to represent his client zealously *within the bounds of the law* (DR 7-101 (A)(1), DR 7-102 (A)(8), CPR of ABA).[17] It is the imperative duty of an attorney to respectfully yield to the rulings of the court, *whether right or wrong (In re Grossman* (1930) 109 Cal.App. 625, 631 [293 P. 683]; DR 7-106 (A), CPR of ABA). "[I]f the ruling is adverse, it is not counsel's right to resist it or to insult the judge—his right is only respectfully to preserve his point for appeal." (*Sacher* v. *United States* (1952) 343 U.S. 1, 9 [96 L.Ed. 717, 723-724, 72 S.Ct. 451]; *In re Buckley, supra,* pp. 253, fn. 21, 255; Standard 7.1(d), ABA Standards-Defense Function). In addition to its

---

[17]The "bounds of the law" include disciplinary rules and enforceable professional obligations. The disciplinary rules, which state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action, are mandatory in character.

*inherent* power to control judicial proceedings in order to insure the orderly administration of justice (*Cooper* v. *Superior Court* (1961) 55 Cal.2d 291, 301 [10 Cal.Rptr. 842, 359 P.2d 274]; *People* v. *Smith* (1970) 13 Cal.App.3d 897, 907 [91 Cal.Rptr. 786, 52 A.L.R.3d 875]; *Mowrer* v. *Superior Court* (1969) 3 Cal.App.3d 223, 230 [83 Cal.Rptr. 125]), a court has *statutory* authority to "provide for the orderly conduct of proceedings before it, or its officers;" (Code Civ. Proc., § 128, subd. 3. See also Pen. Code, § 1044).

Petitioner's conduct in refusing to accede to the court's ruling, despite admonitions from the court, constituted a violation of petitioner's duty to "maintain the respect due to the courts of justice and judicial officers" (Bus. & Prof. Code, § 6068, subd. (b)), as well as a disobedience of a lawful order of the cc⁻rt in contempt of the authority of the court (Code Civ. Proc., §1209, subds. 3, 5).

*Contempt No. 11: Stating in the presence of the jury that the prosecutor had a reasonable doubt as to the defendant's guilt.*

▆▆▆ The judgment of contempt of court entered *nunc pro tunc* October 11, 1972, shows that contemner, on that date, in the presence of the trial jury, made the following statement: " 'Your Honor, in view of Mr. Williams' [the Deputy District Attorney] statement that he has reasonable doubt as to Juan Corona's guilt . . . [interruption].' "

The court found that it was the intention of contemner to convey the alleged statement of Mr. Williams to the jury with the intention to thereby influence the jury in its deliberation and verdict, and that the statement constituted contemptuous and insolent behavior and prejudicial misconduct on the part of the contemner.

In appearing in his professional capacity before a tribunal, a lawyer shall not state or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence (DR 7-106 (C)(1). CPR of ABA). The statement attributed by petitioner to the prosecutor was clearly inadmissible (DR 7-106 (C)(4), CPR of ABA).[18]

Attorneys, by reason of their position and training, have a duty to insure order in our judicial system (*In re Buckley, supra,* p. 254, fn. 21;

---

[18]The prosecutor admitted in chambers that he had made such a statement (see CPR of ABA, DR 7-103 (A) and (B) with respect to duties of public prosecutors). Nevertheless, despite a motion for mistrial on the part of the prosecution and a motion to dismiss by the defense, the court directed that the trial proceed.

Bus. & Prof. Code, §§ 6067, 6068, subd. (b)). It was unprofessional conduct for petitioner to state, in the presence of the jury, that the prosecutor had a reasonable doubt as to the defendant's guilt (Standard 7.5(b), ABA Standards-Defense Function). Conduct such as this could only have the purpose of inflaming the jury or causing the trial judge to declare a mistrial. "Where such a course of conduct is involved, no admonition that it is wrong is required as a prerequisite to a finding of contempt. A lawyer admitted to practice must be held already to know that such flagrant misconduct is improper." (*DeGeorge* v. *Superior Court, supra,* 40 Cal.App.3d 305, 315). Petitioner's conduct was properly punished as a contempt of the authority of the court (Code Civ. Proc., § 1209, subd. 3).

*Contempt No. 12: Improper impeachment of a witness.*

The judgment of contempt of court issued *nunc pro tunc* October 31, 1972, shows that contemner, despite admonishments, while cross-examining a prosecution witness before the jury, engaged in the following colloquy: "MR. HAWK: No, I am trying to point out the fact that he gave a phony address. He lives at the Yuba City Jail. MR. WILLIAMS: I will object. That's improper. MR. HAWK: I can't show where he lives? THE COURT: That [*sic*] is the purpose of it, to show what? MR. HAWK: I am asking if this is where he is living at the current time. THE COURT: As an inmate? MR. HAWK: Yes, he is a thief; he is doing a year in jail. I am entitled to show that."

The court found that the statements by contemner were made with the object of bringing the criminal record of the witness to the attention of the jury for the purpose of affecting the credibility of the witness in the eyes of the jury, the contemner knowing that his statements and proposed inquiry were not a proper means to impeach the witness.

In appearing in his professional capacity before a tribunal, a lawyer shall not intentionally or habitually violate any established rule of procedure or of evidence (DR 7-106 (C)(7), CPA of ABA). **(17)** The deliberate asking of questions calling for inadmissible and prejudicial answers is misconduct (*People* v. *Fusaro* (1971) 18 Cal.App.3d 877, 886, [96 Cal.Rptr. 368], cert. den., 407 U.S. 912 [32 L.Ed.2d 686, 92 S.Ct. 2445]).

Section 787 of the Evidence Code expressly precludes attacking a witness' credibility by showing prior *arrests* for misdemeanors or felonies, or prior misdemeanor convictions (*Grudt* v. *City of Los Angeles* (1970)

2 Cal.3d 575, 591 [86 Cal.Rptr. 465, 468 P.2d 825]). A witness may be impeached, however, by showing that he has been convicted of a felony (Evid. Code, § 788). The proof must show *conviction* of a *felony*, not a misdemeanor (Witkin, Cal. Evidence (2d ed.) § 1244, p. 1147). ▮ Questions designed to bring before a jury the fact that a witness who has not been convicted of a felony is residing in jail evade the rule by indirection and are highly improper (*People* v. *Sutton* (1964) 231 Cal. App.2d 511, 514 [41 Cal.Rptr. 912]).

▮ The record discloses that petitioner questioned a witness in a manner designed to bring before the jury evidence that was inadmissible under Evidence Code section 787. Petitioner's conduct, in violation of established rules of procedure and of evidence, was highly improper and, following a prior warning of the court, constituted a contempt of the authority of the court (Code Civ. Proc., § 1209, subds. 3, 5).[19]

*Contempt No. 13: Display of offensive personality.*

▮ The judgment of contempt of court issued *nunc pro tunc* November 3, 1972, shows that contemner, despite numerous admonishments not to make personal comment about opposing counsel, did, in the presence of the jury, refer to Ronald W. Fahey, one of the opposing counsel, as follows: "I am sorry if I offended the high-priced lawyer."

In appearing in his professional capacity before a tribunal, a lawyer shall not engage in undignified or discourteous conduct which is degrading to a tribunal (DR 7-106 (C)(6), CPR of ABA). It is unprofessional conduct for a lawyer to engage in behavior or tactics purposely calculated to irritate or annoy the court or the prosecutor (Standard 7.1(c), ABA Standards-Defense Function).

An attorney who is a member of the California State Bar has a duty to "abstain from all offensive personality." (Bus. & Prof. Code, § 6068, subd. (f).)[20] Petitioner's reference to the prosecutor as a "high-priced

---

[19]The "rap sheet" of this witness, belatedly produced by the prosecution in compliance with a discovery order (see *Hill* v. *Superior Court* (1974) 10 Cal.3d 812 [112 Cal.Rptr. 257, 518 P.2d 1353]), showed that the witness had been, in fact, convicted of a felony. It is clear from the record, however, that petitioner was not prepared to prove the felony conviction at the time he was cross-examining the witness, and was in fact attempting to bring a misdemeanor conviction to the attention of the jury.

[20]Upon admission to the California State Bar, petitioner took an oath "faithfully to discharge the duties of any attorney at law to the best of his knowledge and ability" (Bus. & Prof. Code, § 6067).

lawyer" was behavior calculated to irritate the prosecutor and to annoy the court, and was a violation of his duty to abstain from all offensive personality. For this violation of his duties, after having been warned to refrain from such conduct, petitioner was properly held in contempt of the authority of the court (Code Civ. Proc., § 1209, subds. 3, 5).

*Contempt No. 14: Failure to yield respectfully to the rulings of the court.*

 The judgment of contempt of court entered *nunc pro tunc* November 10, 1972, shows that contemner, despite admonishments, engaged in the following colloquy while examining a prosecution witness: "MR. HAWK: 'Was an investigation ever conducted of Ray Duron to find out where his whereabouts were on the critical dates?' MR. TEJA: 'Objection, Your Honor, that goes beyond the scope of direct examination.' THE COURT: 'Sustained.' MR. HAWK: 'It is not beyond the scope of common sense.' "

A lawyer should comply promptly with all orders and directives of the court, but he has a duty to have the record reflect adverse rulings or judicial conduct which he considers prejudicial to his client's interests and he has a right to make respectful requests for reconsideration of adverse rulings. (Standard 7.1, ABA Standards-Defense Function.)

Petitioner's comment, after an objection of the prosecution had been sustained, that his question was "not beyond the scope of common sense" was not a respectful request for reconsideration of an adverse ruling, nor was it a respectful means of preserving his point for appeal (see *In re Buckley, supra,* p. 253, fn. 21; DR 7-106A, CPR of ABA).

Although the court accepted petitioner's explanation that he had not intended to affront the court nor to indicate that the court, by sustaining the objection, had displayed a lack of common sense, petitioner's failure to yield respectfully to the rulings of the court, following repeated warnings, constituted a contempt of the authority of the court (Code Civ. Proc., § 1209, subds. 3, 5).[21]

With respect to petitioner's contention that the contempt orders are void because they were infected by allegedly unconstitutional "gag" orders placing restrictions on petitioner's ability to speak with the press, we fail to see the connection between the court's orders limiting *extrajudicial* statements for public dissemination and petitioner's *trial conduct,* and we

---

[21]The disclaimer of an intent to commit contempt is no defense where a contempt clearly appears from the circumstances constituting the act (*City of Vernon* v. *Superior Court, supra,* 38 Cal.2d at p. 518).

shall not permit ourselves to be drawn into determining the constitutionality of those orders in these proceedings.

We now reach petitioner's contention that the trial judge was so "personally embroiled" that due process required trial of the contempt charges before another judge.

In *Mayberry* v. *Pennsylvania* (1971) 400 U.S. 455 [27 L.Ed.2d 532, 91 S.Ct. 499], it was held that due process requires a new and impartial judge where there is evidence that the trial judge "has become so 'personally embroiled' with a lawyer in the trial as to make the judge unfit to sit in judgment on the contempt charge." (P. 465 [27 L.Ed.2d p. 540]; *In re Buckley, supra*, 10 Cal.3d at p. 256; *In re Grossman, supra*, 24 Cal.App. 3d at p. 632; *DeGeorge* v. *Superior Court, supra*, 40 Cal.App.3d at p. 315.) In *Buckley*, however, our Supreme Court concluded that *Mayberry* did not apply because (1) unlike *Mayberry*, the trial court did not wait to adjudge petitioner in contempt, but immediately cited him and soon thereafter signed the order of commitment, and (2) the attack there did not consist of "fighting words" which the court found in *Mayberry* carried such a potential for bias as to require disqualification (*In re Buckley, supra*, at p. 256).

In this case, unlike *Mayberry*, where the defendant was sentenced for each of eleven contempts after the trial ended, and unlike *Taylor* v. *Hayes* (1974) 418 U.S. 488, 490 [41 L.Ed.2d 897, 903, 94 S.Ct. 2697], where the trial judge postponed final adjudication and sentence of nine contempts until after the conclusion of trial, the trial judge did not wait until the end of the trial to adjudicate petitioner in contempt. Instead, the trial judge dealt with each contempt as a discrete and separate matter at a different point during the trial. In each instance, the trial judge conducted contempt proceedings in chambers following the allegedly contemptuous conduct, where petitioner was given an opportunity to be heard in defense or mitigation, and where petitioner was convicted and sentenced, with execution of the sentence suspended until such time as the jury was discharged, a procedure approved in *People* v. *Fusaro, supra*, 18 Cal.App. 3d at pages 888-891, and in *In re Grossman, supra*, 24 Cal.App.3d at pages 628-629.

In *Codispoti* v. *Pennsylvania* (1974) 418 U.S. 506, 513 [41 L.Ed. 2d 912, 920, 94 S.Ct. 2687] the court recognized that "There are recurring situations where the trial judge, to maintain order in the courtroom and the integrity of the trial process in the face of an 'actual obstruction of justice,' [citations]" must necessarily convict and sentence the accused

or the attorneys for either side for various acts of contempt as they occur. The court noted, moreover, that a judge, when faced with the kind of conduct at issue in *Mayberry*, " 'could, with propriety, have instantly acted, holding petitioner in contempt . . . .' [*Mayberry* v. *Pennsylvania, supra*] 400 U.S., at 463." (418 U.S. at pp. 514-515 [41 L.Ed.2d at p. 921].)

The record discloses, however, that petitioner at no time engaged in the kind of personal attack on the judge that, regardless of his reaction or lack of it, he would be unlikely "to maintain that calm detachment necessary for fair adjudication." (*Mayberry* v. *Pennsylvania, supra,* 400 U.S. at p. 465 [27 L.Ed.2d at p. 540]; *Taylor* v. *Hayes, supra,* 418 U.S. at p. 501 [41 L.Ed.2d at p. 909].) In *Taylor* v. *Hayes, supra,* however, it was held that "contemptuous conduct, though short of personal attack, may still provoke a trial judge and so embroil him in controversy that he cannot 'hold the balance nice, clear and true between the State and the accused . . . .' *Tumey* v. *Ohio,* 273 U.S. 510, 532 (1927)." The court stated that "In making this ultimate judgment, the inquiry must be not only whether there was actual bias on respondent's part, but also whether there was 'such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.' *Ungar* v. *Sarafite,* 376 U.S. 575, 588 (1964). 'Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties,' but due process of law requires no less. *In re Murchison,* 349 U.S. 133, 136 (1955)." (418 U.S. at p. 501 [41 L.Ed.2d at p. 909].) We note that in *Taylor* v. *Hayes* it was not petitioner's conduct, considered alone, that required recusal; rather, the critical factor was the *character of respondent's response to misbehavior during the course of the trial.* (418 U.S. at p. 503, fn. 10 [41 L.Ed.2d at p. 910].)

With these considerations in mind, we have examined the record in this case. In light of all the circumstances shown, we are unable to characterize the judge's response to petitioner's behavior during the course of the trial as approaching the aggravated type of response found to exist in *Taylor* v. *Hayes, supra* (418 U.S. p. 501 [41 L.Ed.2d pp. 909-910]), or in *Offutt* v. *United States* (1954) 348 U.S. 11, at pages 15-17 [99 L.Ed. 11, at pages 16-18, 75 S.Ct. 11]. Unquestionably, in the course of a trial of four months, the trial judge on occasion expressed irritation with petitioner.[22] However, as in *DeGeorge* v. *Superior Court, supra,* "most

---

[22]In chambers, in admonishing petitioner for his misconduct, the judge portrayed petitioner's behavior on various occasions as "shocking," "outrageous," "disgraceful," and a "disgrace to the administration of justice."

of the trial judge's irritation was expressed not in relation to petitioner's conduct, which was disrespectful, but rather in response to petitioner's misconduct in seeking an unfair advantage over his opponent." (40 Cal. App.3d at p. 316.) The record on the whole reveals amazing patience on the part of the trial judge in his efforts to maintain order in the courtroom and the integrity of the trial process.[23]

We have concluded from all the circumstances shown in the record before us that the judge's involvement was one to protect the process of a fair trial and was not personal (see *DeGeorge* v. *Superior Court, supra,* at p. 316).[24] Moreover, the judge convicted and sentenced petitioner for the various acts of contempt as they occurred. █ █ "Undoubtedly, where the necessity of circumstances warrants, a contemnor may be summarily tried for an act of contempt during trial and punished by a term of no more than six months." (*Codispoti* v. *Pennsylvania, supra* (418 U.S. at p. 514 [41 L.Ed.2d at p. 920]); see also *Mayberry* v. *Pennsylvania, supra,* 400 U.S. at p. 463 [27 L.Ed.2d at p. 539].)[25]

Under the circumstances shown, we do not find " 'such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.' " (*Taylor* v. *Hayes, supra,* 418 U.S. at p. 501 [41 L.Ed.2d at p. 909], quoting *Ungar* v. *Sarafite, supra,* 376 U.S. 575, 588 [11 L.Ed.2d 921, 930, 84 S.Ct. 841].)

---

[23]The judge, of course, had the obligation to maintain order and decorum in the proceedings before him (Canon 3 A(2), Canons of Judicial Ethics of the American Bar Association), and the power to punish any contempt in order to protect the rights of the defendant and the interests of the public by assuring that the administration of criminal justice shall not be thwarted (Standard 7.1, ABA Standards Relating to the Function of the Trial Judge; cf. *People* v. *Haldeen* (1968) 267 Cal. App.2d 478, 483 [73 Cal.Rptr. 102]).

[24]Petitioner himself asserts that none of his actions were "Disorderly, contemptuous, or insolent . . . *toward the judge"* (italics added) within the meaning of Code of Civil Procedure section 1209, subdivision 1.

[25]A contempt charged under the provisions of section 1209 of the Code of Civil Procedure is a petty offense and petitioner had no federal constitutional right to a jury trial (*In re Morelli* (1970) 11 Cal.App.3d 819, 850 [91 Cal.Rptr. 72]; *Pacific Tel. & Tel. Co.* v. *Superior Court* (1968) 265 Cal.App.2d 370, 375 [72 Cal.Rptr. 177]; *Taylor* v. *Hayes, supra,* 418 U.S. at p. 495 [41 L.Ed.2d at p. 905]). Where separate contemptuous acts are committed, the contemner may be punished for each separate offense (*Donovan* v. *Superior Court* (1952) 39 Cal.2d 848, 855 [250 P.2d 246]). And where the trial court has jurisdiction, a sentence imposing punishment within the statutory limits for each offense will not be disturbed by a reviewing court (*In re Karpf* (1970) 10 Cal.App.3d 355, 374 [88 Cal.Rptr. 895]). None of the individual citations for contempt carried a penalty of more than five days in jail and a $500 fine. Thus, each fell within the "petty" classification.

The judgments relating to the contempts herein referred to as Contempts Nos. 5 and 8 are annulled; the judgments relating to the remaining contempts are sustained. The petition for a writ of habeas corpus is granted in part, and petitioner is ordered discharged from any custody based upon the judgments relating to contempts herein referred to as Contempts Nos. 5 and 8. To the extent petitioner seeks habeas corpus relief in addition to that provided for herein, the petition is denied and the order to show cause is discharged.

Rouse, J., concurred.

A petition for a rehearing was denied October 25, 1974, and petitioner's application for a hearing by the Supreme Court was denied December 11, 1974. Mosk, J., was of the opinion that the application should be granted.