## PLUNKETT *v.* HAMILTON, and *vice versa.*

1. Under the Civil Code (1910), § 4644, every court, whether a court of record or not, has power to punish for contempt committed in its immediate presence.
2. Under the act creating a board of police commissioners for the City of Augusta, and the acts amendatory thereof, such board, when sitting for the trial of charges preferred against a police officer, is a court, within the meaning of the Civil Code (1910), § 4644.
3. The affirmative provision made by the act of 1881 (Acts 1880-81, p. 369) for the punishment of a witness who might fail to appear in obe-

dience to a summons did not destroy the power of the board, when sitting as a court, to punish for contempt committed in its presence.

4. On a trial before such board, a witness having appeared in response to a summons, but having refused to testify in answer to a question put to him, and having been adjudged guilty of contempt, it was error to discharge him from custody, under a writ of habeas corpus, on the ground that the provision of the act of 1881, authorizing the police board to punish a witness who failed to·appear in answer to a summons excluded the power to punish for any contempt committed in its presence.

5. Under the Penal Code (1910), § 1300, a return to a writ of habeas corpus should be verified by the oath of the person to whom the writ is directed and who makes the return, and not by some other person. But where it appeared from the application itself, as well as from the return made, that the applicant was held in custody by the jailer of the county under a sentence of a court, it was proper to refuse to discharge him, on motion, because the return was verified by another than the respondent.

6. Under the acts of the legislature referred to in previous headnotes, the limitation upon the power of the board of police commissioners of Augusta to punish a witness for refusing to testify is the same as that fixed for the punishment of a witness who fails to appear in obedience to the summons.

7. If a reporter of a newspaper is summoned to testify before a court of competent jurisdiction, and is asked as to the person from whom he derived information in regard to certain facts stated by him in a newspaper article, such evidence being material to the issue on trial, he can not claim exemption as a witness from answering the question on the ground that he had received this information under a promise that he would not divulge the name of his informant, that to do so would subject him to ridicule and contempt, and that it would cause him to lose his position as a newspaper reporter.

8. None of the other points made and pressed before this court were such as to have required a discharge of the applicant under the writ of habeas corpus.

MARCH 14, 1911.

Habeas corpus. Before Judge Hammond. Richmond superior court. November 7, 1910.

*C. Henry Cohen,* for plaintiff in error.

*Archibald Blackshear,* contra.

LUMPKIN, J. T. J. Hamilton presented his petition for the writ of habeas corpus to the judge of the superior court of Richmond county. It alleged, among other things, as follows: The plaintiff is restrained of his liberty by J. T. Plunkett, the jailer of the county, who is detaining him in the common jail. The pretense for said restraint is an order of the board of police commissioners of the City of Augusta, which is as follows: "Thomas Hamilton, a witness before the Police Commission of the City of

Augusta, having refused, after being duly sworn, in accordance with the statute in such cases provided, to testify in the case then pending before the said Commission, and having declined to testify, it is considered, ordered and adjudged by the Board that the said Thomas Hamilton be considered in contempt, and that he be fined in the sum of Fifty Dollars, and upon failure to pay said fine or to purge himself of said contempt by Monday, October 17th, 1910, at 12 o'clock M., he shall be imprisoned in the common jail of the County, until the said fine shall be paid, the imprisonment to last not longer than five days." He further alleged, that, under the law creating the board of police commissioners of Augusta, that board had no jurisdiction of the plaintiff; and that it had no authority to pass such an order, and the order was void. Upon the hearing the applicant moved the court to strike the return of the respondent and to discharge the applicant because the return was not sworn to by the person to whom the writ was directed, but by the chief of police of the city. After a hearing on the merits he moved that he be discharged on other grounds. The presiding judge granted the discharge on the ground that the police board could only punish a witness for not appearing, but had no power to punish him for refusing to testify. The respondent excepted. The applicant also filed a bill of exceptions, and assigned error on the refusal to strike the return and certain parts of it, and to discharge him on grounds other than that on which the judgment was based.

1-4. It has been held by many courts that the power to punish for contempt is inherent in the very constitution and organization of a court, and is necessary to the proper exercise of its functions, and indeed to its very existence as a court. It has also been held that the power exists independently of any statute conferring it. Clark *v.* People, Breese (Ill.), 340 (12 Am. D. 177, 178 and note). The power was declared by Sir William Blackstone to result from the first principles of judicial establishments, and to be an inseparable attendant upon every superior tribunal. "Accordingly," he said, "we find it actually exercised, as early as the annals of our law extend." He stated that a certain learned author seemed inclined to derive the process of attachment from the statute of Westm. 2 (13 Edw. I, c. 39), "yet he afterwards more justly concludes, that it is a part of the law of the land; and, as such, is

confirmed by the statute of magna charta." 4 Bl. Com. 286. While the author uses the expression "every superior tribunal," the decisions of the English courts applied the rule to all those recognized as courts of record. In America, even in the absence of a statute, it is held in some jurisdictions that courts of justice, whether of record or not, possess this power. In others this is denied as to inferior courts, not courts of record, such as justice and municipal or police courts. 4 Bl. Com. (Hammond's ed.) top p. 368, note 28.

Whatever diversity of views may exist in other courts, as to the power of inferior courts not of record in relation to punishing for contempts, where there is no statute on the subject, in this State the matter is settled by the provisions of the code. By article 6, section 1 of the constitution (Civil Code (1910), § 6497) it is declared that the judicial powers of the State shall be vested in a Supreme Court, a Court of Appeals, superior courts, courts of ordinary, justices of the peace, commissioned notaries public, and such other courts as have been or may be established by law. The Civil Code (1910), § 4640, states that the judicial power of the State is vested in such tribunals as are created by the constitution, and such other inferior courts as are or may be established by law, "and such persons as are or may be specially invested with powers of a judicial nature." Section 4644 declares that "Every court has power— . . To preserve and enforce order in its immediate presence, and as near thereto as is necessary to prevent interruption, disturbance, or hindrance to its proceedings. . . To compel obedience to its judgments, orders, and process. . . To control, in furtherance of justice, the conduct of its officers and all other persons connected with a judicial proceeding before it, in every matter appertaining thereto." These powers are not confined to superior courts or courts of record, but are declared to belong to "every court." In *Swafford* v. *Berrong*, 84 *Ga.* 65 (10 S. E. 593), it was held: "In this State inferior courts not of record can fine for contempt. A town council made by charter a court, with 'full power and authority to punish all offenders against the laws, rules, and regulations of said town by fine and imprisonment, either or both,' could inflict a fine if necessary to 'preserve and enforce order in its immediate presence.'"

If the board of police commissioners of Augusta constituted an

inferior court, when engaged in the trial of policemen, it had the powers incident to other courts, stated above. That board was created by the act of August 26, 1879 (Acts 1879, p. 311). Among the powers conferred upon it were "to elect, discharge, or suspend or fine the officers and privates of said force." By statute of September 14, 1881 (Acts 1880-81, p. 369), it was enacted as follows: "That when any person, resident in the City of Augusta, shall be required to attend as a witness the trial of any officer or officers, private or privates, of the police force, before the said board, it shall be the duty of the secretary of the board, upon application, to issue a summons directed to such person, stating the case and the time appointed for the trial; such summons may be served personally on the witness by any member of the said board of commissioners or of the police force, at least one day before the trial of the case; and if any witness thus summoned shall fail to appear, he may be attached by the commissioners for contempt. The attachment shall be directed to the chief of police, or any officer of the police force of Augusta, and made returnable before the said board at some time stated, and the said board may punish said witness by a fine not exceeding fifty dollars, unless he show good cause for his failure to obey the summons; and in the event of his refusal or failure to pay the fine imposed, the said board may imprison said witness in the common jail of the county until said fine be paid, the term of imprisonment to last in no case longer than five days." On December 6, 1902, an amendment to the two acts cited was adopted (Acts 1902, p. 342). By this act the following provision was added: "The president or acting president of said board of police commissioners shall have authority to administer to any witness who appears before such commission, at the trial of any officer or private, an oath or affirmation substantially as follows: 'You do solemnly swear or affirm that the evidence you shall give to the police commissioners of Augusta upon the hearing of the charge against ——————— ——————— shall be the truth, the whole truth, and nothing but the truth, so help you God.' Any person swearing or affirming falsely after the above oath or affirmation shall have been administered to him shall be guilty of perjury and punishable accordingly." Under these acts, whatever may have been the discretionary administrative powers of the board, it is clear that the legislature contemplated cases in

which charges would be preferred against policemen, and in which trials would be had and judgments rendered. Express reference was made to "the trial" of any policeman "before the said board," to "the time appointed for the trial," and to the proceeding as "a case;" and provision was made for summoning any resident of the city to attend such trial as a witness. The president of the board was authorized to administer an oath to witnesses, and any person who should swear or affirm falsely was declared to be guilty of perjury and punishable accordingly. The distinction between the offense of perjury and that of false swearing is that one is committed in some judicial proceeding, while the other is committed in some matter or thing other than such a proceeding. Penal Code (1910), §§ 259, 261. We think it is evident that, in the trials for which provision was thus made, the police board sits as an inferior court of special jurisdiction. As such, it was invested with the power to punish for contempts committed in its presence, declared by the statute of this State to belong to all courts.

The judge of the superior court, before whom the case was heard under the writ of habeas corpus, held that the express declaration of the act of 1881, that the board might punish a witness for failure to appear when summoned, impliedly excluded all other power to punish for contempt. In the opinion filed by him, he said that there were two distinct types of legal contempt, one committed in the presence of the court, the other without the presence of the court; that the act of 1881 made provision for only one form of contempt—that form committed without the presence of the commissioners, by failing to appear as a witness; and that the board had no authority to punish for any contempt, except for failure to appear as a witness when duly summoned. We think he carried the doctrine of strict construction and the maxim *inclusio unius exclusio alterius* somewhat too far. While proceedings to attach for contempt which are punitive in their nature are sometimes spoken of as criminal, yet in many respects they are not strictly criminal cases, or subject to the rules of indictment, trial, sentence, and review, which apply to criminal cases strictly so called. Even in the latter class of cases it was said by the Supreme Court of the United States in United States v. Wiltberger, 5 Wheat. 76, 94 (5 L. ed. 37), that, "Though penal laws are to be construed strictly, yet the intention of the legislature must govern in the

construction of penal, as well as other statutes, and they are not to be construed so strictly as to defeat the obvious intention of the legislature." If, as we have held, the board of commissioners, when sitting for the trial of a policeman, was an inferior court, it did not depend for its power to preserve order and to punish contempts committed in its presence upon the special statutory declaration in the acts creating it and the acts amendatory thereof. That power inhered in the board, when so sitting, under the general law contained in the code. Some courts have held, in the absence of any statutory provision on the subject, that inferior courts might punish for contempts committed not in their presence, as well as for those which are so committed. Other courts have held that the power of inferior courts to punish for contempts was limited to those which occurred in their presence. Possibly on the idea that some question might be raised on this subject, the legislature saw fit to expressly declare that the police board of Augusta might punish a witness who had been summoned, for a failure to appear; but it was never intended, by conferring this power, to destroy all other powers inherent in that body under other laws. Suppose the legislature should declare that a certain court might punish for contempt any person who should deface the walls of the courtroom or cut or destroy the furniture, they would certainly not intend this to negative the power of the court to preserve order or to enforce the decent and orderly conduct of persons before it. In providing for enforcing the attendance of a person *as a witness,* the legislature could hardly have meant that the person so summoned could come to the place where the trial was being had, but refuse with impunity to be a witness, that is one who, being sworn or affirming according to law, deposes as to his knowledge of facts in issue in the case. 1 Bouv. Law Dict. 658; Bliss *v.* Shuman, 47 Me. 248, 251; 8 Words & Phrases, 7511, word "Witness." If the provision for punishing a person who failed to obey such summons excluded the power to punish for contempts committed in the presence of the board, any person might be guilty of the most disorderly conduct, make unendurable noises, and break up the trial, with no ability on the part of the board to punish for the flagrant contempt, provided only the contemner was careful to exhibit his contempt in their presence and not at a distance. We do not think this is the law.

It would serve no good purpose to discuss decisions of various courts as to particular officers or administrative boards created by statutes, and whether they constitute courts within the meaning of the acts of Congress providing for the removal of causes to the circuit court of the United States, or within the meaning of certain other State or Federal laws. Each of these cases must depend to a large extent upon the terms of the statute under consideration, or upon which of the two conflicting views already mentioned, in regard to the power of inferior courts to punish for contempts, in the absence of a statute on the subject, is taken in the particular jurisdiction. The presiding judge erred in discharging the applicant for the writ of habeas corpus on the ground upon which he based his decision.

The applicant filed a cross-bill of exceptions complaining that the judge did not grant the discharge on certain other grounds. Some of the points raised by the cross-bill are controlled by what has already been said.

5. It was contended that the judge erred in not rejecting or striking the return, on the ground that it was not verified by the respondent but by another person, and in not discharging the applicant on that ground. At common law no verification of a return was necessary. Church on Habeas Corpus (2d ed.), § 124. It was not necessary to specifically set out in the return documents referred to. Ib. § 139. It was held that the return should not be taken so strictly as other pleadings were, "and that the court ought not to be tied up wholly to the matter appearing upon the record, but that the return might be supplied and supported by evidence of fact, record, custom, or the like." Ib. § 154. Under our statute the return to a writ of habeas corpus is required to be under oath. Penal Code (1910), § 1300. The intention of the statute was that the person making the return should verify it. In this case the writ was directed to the jailer of the county. He made a return, but it was verified by the affidavit of the chief of police of the City of Augusta. On objection, the presiding judge should have required the respondent to verify his own return. But the omission of a proper verification did not require the discharge of the applicant, on motion. The application itself, as well as the return, showed that the applicant was held under the sentence of a court. If the rule sought to be established were correct, if one

convicted of murder should take out a writ of habeas corpus, and the jailer should return the fact that he was held under sentence, but omit to make affidavit to the return, the judge would have to set the convicted murderer free at once on motion. In truth, the writ of habeas corpus is a great writ, when properly applied. It is peculiarly a writ which involves substance, not mere technical skirmishing. The question is whether the detention is lawful or not, rather than whether niceties of pleading and exactness of allegation have been duly followed. *Simmons* v. *Georgia Iron & Coal Co.,* 117 *Ga.* 305 (43 S. E. 780, 61 L. R. A. 739); Penal Code (1910), § 1305.

6. It was further contended, that if the board of police commissioners had authority to punish for contempt, they were limited, in the extent of the penalty which they could impose, to the punishment which a justice of the peace might inflict under similar circumstances; that they exceeded their authority; and that they had no power to compel by imprisonment the payment of the fine imposed. In *Swafford* v. *Berrong,* 84 *Ga.* 65 (10 S. E. 593), supra, it was urged that the municipal council could not impose the penalty which they sought to do. It was held, that if the legislature should fail to enact a law limiting the power of the courts to punish for contempt, such failure to restrict the power would not destroy the power itself. Fine and imprisonment are the immemorial punishments which have been inflicted for contempts. It was said, in the opinion in the case just cited, that the court "was inclined to think" that the power of punishment was limited, by analogy, to the power of a justice's court on that subject. But it was further said, that, if this were not correct, the charter of the town itself furnished a limitation upon the power. The charter declared that no fine inflicted by the common council should exceed twenty dollars. This applied to fines for violation of the "laws, rules, and regulations of said town." But it was held that the limitation should be applied also to a fine for contempt. In the case before us, if the legislature has not prescribed a limit of punishment, this would not destroy the power to punish for contempt. If a limitation is to be fixed, we think it should be drawn from the act prescribing a punishment for the failure of a witness to obey a subpœna, rather than from an analogy to a justice's court. In dealing with the punishment of a witness who

fails to appear in obedience to a summons, the act of 1881 provides that the board may punish the witness by a fine not exceeding fifty dollars, "unless he show good cause for his failure to obey the summons; and in the event of his refusal or failure to pay the fine imposed, the said board may imprison said witness in the common jail of the county, until said fine be paid, the term of imprisonment to last in no case longer than five days." If the witness appeared but unlawfully refused to testify, and thus did not in substance fully obey the summons, we think the limitation upon punishment declared by the act quoted should be applied.

7. One ground of the motion made to discharge the applicant for the writ was that the questions asked him by the board "were questions which he, as a citizen, had a legal right to refuse to answer, for the reason that to answer them would cause him the forfeiture of an estate, to wit, it would cause him to lose his means of earning a livelihood." It appeared that, on a trial before the board, the applicant for the writ was summoned as a witness. In answer to questions he testified that he wrote a certain article appearing in the Augusta Herald, a newspaper of that city, containing information in connection with a murder, and that he received this information, or the substance of it, from an officer or member of the police department of Augusta. He was then asked, "From whom did you get it?" He stated that he had obtained the information with the assurance that the name of his informant would not be divulged, "and that he regarded his obligation not to divulge the name of his informant as sacred as the obligation to tell the truth after being sworn by the commission;" that, from his information and belief, he believed he would forfeit the respect and confidence of the community at large if he divulged the name of his informant, and that to do so would subject him to ridicule and contempt. In answer to a question by his counsel, as to what would be the effect of his answering the last question propounded, so far as his occupation as a newspaper reporter was concerned, he answered, "It would ruin me in my business; it would cause me to lose my position as a newspaper reporter for the Augusta Herald, and would prevent my ever engaging in the occupation of a newspaper reporter again."

The theory that the applicant would forfeit an estate by answering the question is of course unfounded in law. There would

be no forfeiture by law resulting from his answer. What he really meant, no doubt, was that he apprehended that his employer would discharge him if he stated the source of his information. The real point which the applicant apparently seeks to make is, that, by promising to keep the name of his informant a secret, he can free himself from the duty of testifying in a court, when called on so to do, and that employees can claim an exemption from testifying, because they apprehend that they will be discharged if they do so. Neither one of these positions is tenable. In 4 Wigmore on Evidence, § 2192, it is said: "For three hundred years it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. We may start, in examining the various claims of exemption, with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional and are so many derogations from a positive general rule." In the early English practice it was not uncommon for a person to claim a privilege against answering a question, on the ground that he had received the information in confidence and had pledged himself not to divulge it. This claim of exemption from testifying, which was sometimes called the "point of honor," was considered and overruled in 1776 in the Duchess of Kingston's case, 20 How. St. Tr. 586, and again in 1777 in Hill's trial, 20 How. St. Tr. 1362. Professor Wigmore states that "The 'point of honor' thus disappeared forever as a motive for recognizing a privilege." 4 Wigmore on Evidence, § 2286. He also states, that, "In general, then, the *mere fact that a communication was made in express confidence,* or in the implied confidence of a *confidential relation,* does not create a privilege. This rule is not questioned to-day. No pledge of privacy, nor oath of secrecy, can avail against demand for the truth in a court of justice. . . Accordingly, a confidential communication to a *clerk,* to a *trustee,* to a *commercial agency,* to a *banker,* to a *journalist,* or to any other person not holding one of the specific relations hereafter considered, is not privileged from disclosure." In People *v.* Fancher, 4 N. Y. Supreme Court, 467, a witness before a grand jury, upon a complaint for libel published in a newspaper, was asked to disclose the name of the writer, which he admitted he knew. Upon refusing to do so, the court committed him

to the county jail. It was held that this was lawful. In the opinion Westbrook, J., said: "As the law now is, and has for ages existed, no court could possibly hold that a witness could legally refuse to give the name of the author of an alleged libel, for the reason that the rules of a public journal forbade it." The same ruling has been adopted in Georgia in *Pledger* v. *State,* 77 *Ga.* 242 (3 S. E. 320). It was held, that, in a prosecution for the publication of a libel in a newspaper, the proprietor or publisher of the newspaper containing the defamatory matter was a competent witness, and if he refused to testify in the case, or to state the name of the real author of the publication, he might be punished for a contempt of court, as any other witness refusing to testify. In Ex parte Lawrence, 116 Cal. 298 (48 Pac. 124), it was held: "Where the State Senate is investigating the conduct of its members, under a published charge that some of them, whose names were not given, have taken bribes, and has called as witnesses the editor and a reporter of the paper which published the charge, it is a contempt of the Senate's authority for the witnesses to refuse to give the names of those from they had received information touching the charge of bribery, and the nature of that information." It was held that such information was not a privileged communication. In Rogers *v.* State, 88 Miss. 38 (40 So. 744), on an investigation by a grand jury into the larceny of an express package, a witness testified that a woman brought the package to him to be returned to the express company, upon his promise of secrecy and immunity from prosecution of the one who committed the larceny. It was held proper to impose a fine on the witness for refusing to give the name of the woman who brought in the package. In the opinion, Calhoon, J., said: "Individual standards of elevated principles of social duty can not be permitted to terminate investigations so absolutely essential to the public welfare."

It is declared in the constitution of this State that "Protection to person and property is the paramount duty of government, and shall be impartial and complete." Civil Code (1910), § 6358. In order that the judicial department of the government may discharge its duty in this regard, it is essential that the courts shall have the power to command and compel the giving of testimony. The citizen or inhabitant owes to the State the duty of testifying, when lawfully called upon to do so, in order that the truth may

be ascertained and impartial and complete justice be done. Omitting any reference to instances which are expressly excepted, the law requires a witness to testify, when duly summoned before a court having jurisdiction, and called upon to give competent and relevant evidence. A promise not to testify when so required is substantially a promise not to obey the law. Such promises can not be recognized, save in subordination to the requirements of the law. Neither can the wishes, or even the commands, of employers be allowed to outweigh the commands of the law. If the views sought to be maintained in this case were permitted to prevail, the power to ascertain the truth in judicial investigations, and to administer justice accordingly, would depend, not upon the law of the land, but upon the private promises of secrecy on the part of witnesses, or upon the wishes or orders of their employers. To sustain such a doctrine would render courts impotent and the effort to administer justice oftentimes a mockery. An extreme illustration will serve to show where such theories, pursued to their logical end, might lead. A murderer, a burglar, or a thief might pledge his friends or their employers to secrecy, and succeed in concealing himself or the results of his crime; and when the witnesses who had knowledge of the facts were placed upon the stand, they might claim exemption from testifying, on the ground that they had pledged their sacred words to the criminal not to do so, and that they considered it disgraceful to violate such promise, or that they feared a loss of their employment if they testified to the truth.

The facts disclosed by the record before us do not show any such forfeiture of an estate as will result by operation of law, or any such demand for self-incrimination or for disclosure by the witness of conduct on his own part or facts tending to bring infamy, disgrace, or public contempt upon himself, as gave him a privilege to refuse to answer the question propounded.

The judgment committing the witness for contempt recited that he was duly sworn to testify in a "case" pending before the commission, and declined to do so, and that he was adjudged guilty of contempt. There was no contention that there was no actual trial of a case against a police officer. Some other points were made, but they were without merit; and one or two of them were not even mentioned in the brief of counsel for plaintiff in error.

The case is not like that of *Brieswick* v. *Mayor etc. of Bruns-*

*wick,* 51 *Ga.* 639 (21 Am. Rep. 240), where a municipal charter contained an alternative power to punish offenders against city ordinances by fine or by imprisonment, and it was held that this did not include the power to coerce the payment of a fine by imprisonment. In reference to that case see *Leonard* v. *Mayor etc. of Eatonton,* 126 *Ga.* 63 (54 S. E. 963).

The distinction between the right to impose one sentence or to impose another, in the alternative, in the discretion of the punishing power, and the power to enforce the payment of a fine by imprisonment is recognized in the authorities. Here the board had the power, when sitting as a court for the trial of a case, to punish for contempt by a witness in refusing to testify, and to sentence him to jail until he paid the fine imposed, the term of the imprisonment not to exceed five days.

As the judgment is reversed on the main bill of exceptions, direction is given that the presiding judge require the respondent to verify his return to the writ.

*Judgment reversed on the main bill of exceptions, and affirmed on the cross-bill. Fish, C. J., absent, The other Justices concur.*