JOHN WRIGHT, PETITIONER-APPELLANT, v. PLAZA FORD AND SECOND INJURY FUND, RESPONDENTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 30, 1978—Supplemental Brief of the Attorney General Received August 4, 1978—Decided November 28, 1978.

204

Before Judges FRITZ, BOTTER and ARD.

*Mr. Samuel E. Bass* argued the cause for appellant (*Messrs. Freeman* and *Bass*, attorneys).

A statement in lieu of brief was filed by *Mr. Robert G. Bressler*, attorney for respondent Plaza Ford.

A statement in lieu of brief and supplemental brief were filed by *Mr. John J. Degnan*, Attorney General of New

Jersey, attorney for respondent Second Injury Fund (*Mr. William F. Hyland,* former Attorney General of New Jersey, and *Mr. Michael S. Bokar,* Deputy Attorney General, on the statement, and *Mr. Stephen Skillman,* Assistant Attorney General, on the supplemental brief).

The opinion of the court was delivered by
BOTTER, J. A. D. This is an appeal from that portion of a judgment entered in the Division of Workers' Compensation which allowed petitioner's attorneys a counsel fee of $3,000 and from the refusal to increase the award on a motion for reconsideration. This appeal also seeks review of the fees allowed to petitioner's three expert medical witnesses of $50 each, purportedly in conformity with *N. J. S. A.* 34:15–64. In addition, although not named as a separate party, Samuel Bass, an attorney, appeals from three orders orally entered holding him in contempt for misconduct in the presence of the judge of compensation. The alleged contempts occurred at the hearing on the motion for reconsideration of counsel fees. That hearing was followed by a proceeding three days later limited to the sentence to be imposed on the contempt determinations. For each contempt a $50 fine and a one-day jail sentence were imposed, but the custodial sentence was suspended. Bass contends that his conduct was not contemptuous, that the exercise of the contempt power was not authorized by statute, that it is unconstitutional, and that the contempt proceedings were procedurally deficient.

First we deal with the counsel fee awarded to petitioner's attorneys. Petitioner suffered a myocardial infarction at Plaza Ford's place of business after running up a flight of steps on July 5, 1972 when his boss told him to turn off an alarm. He collapsed and was taken to the hospital where he remained for 23 days. He has not worked since.

The judge of compensation found petitioner totally and permanently disabled from several causes. The major cause was the compensable heart condition which accounted for

50% disability. Additional disability of 25% was based upon anxiety, resulting from the July 5, 1972 episode, which was termed a psychoneurosis of a conversion hysterical reaction type with left hemihypesthesia and loss of motor power of the extremities on the left side. Petitioner also suffered from chronic bronchitis which was found to be compensable to the extent of 5% of total. The total disability as a physiological and industrial unit was attributed to the disability incurred in his last employment with respondent Plaza Ford added to preexisting non-compensable conditions which included diabetes, arteriosclerotic heart disease and hypertension. The compensable award was $27,720, representing 360 weeks (80% of 450 weeks) at $77 a week. Eventually, petitioner will receive payments from the Second Injury Fund also.

There were five hearing dates due to the unavailability of petitioner's medical experts on a single date. The transcript of one hearing comprises only 13 pages dealing with the introduction of a hospital record and brief medical testimony as to petitioner's loss of hearing and nasopharyngitis. The transcript of all testimony occupies 148 pages. At the final hearing, reports of Plaza Ford's medical experts were introduced by consent, no witnesses were called by Plaza Ford or the second injury Fund, and all parties submitted without summation and argument. The decision was then announced.

On the issue of the counsel fee awarded petitioner's attorneys, no affidavit of services was submitted in the agency below and no application was made to enlarge the record before us.[1] See *Barbarevech v. Johns-Manville Prod-*

---

[1] We note the impropriety of including in the appendix transcripts of cases other than the case on appeal without prior leave of this court to supplement the record. *R.* 2:5-4(a) ; *R.* 2:5-5(b). We also condemn counsel for including in appellant's brief in this case references to another case on appeal not yet consolidated with this case on the ground that appellant "will move" for such consolidation.

*ucts Corp.*, 143 *N. J. Super.* 31, 34 (App. Div. 1976), certif. den. 73 *N. J.* 58 (1977). However, at oral argument in the agency below petitioner's counsel recited the scope of his firm's services. Despite the absence of specific findings by the compensation judge and affidavits detailing the services rendered and time spent, the transcripts of the workers' compensation hearings and the oral representations on the motion for reconsideration of counsel fees furnish us a sufficient basis to evaluate the award without a remand. *R.* 2:10–5; *cf. Gromack v. Johns-Manville Products Corp.*, 147 *N. J. Super.* 131, 137 (App. Div. 1977).

 Bass contended before the judge of compensation and contends here that a fee representing approximately 11% of the compensation award is inadequate and that the "customary counsel fee awarded in the Division is somewhere between 1/6 [16.7%] of the award and 20% of the award." This position was properly rejected below. The *Barbarevech* and *Gromack* cases, *supra,* make clear that "although the amount of the award is a factor to be considered in fixing the fee, it has limited significance." *Gromack, supra,* at 134–135. "The more important factors are the nature and extent of the services and the responsibility involved." *Id.* at 135. Thus, the notion of a narrow range near the 20% maximum fee allowed by *N. J. S. A.* 34:15–64 was properly rejected below. On the basis of our independent examination of the record made by Bass in the Division, we affirm the award of a $3,000 fee as within the discretion of the judge of compensation. *Cf. Gromack, supra,* where a counsel fee of $7,000 was reduced to $5,000. That case was settled after testimony was taken at two hearings and dependency benefits of $45,000 were awarded. 147 *N. J.*

On our own motion we strike from appellant's brief and appendix all references to other proceedings not embraced in a published opinion. We mention that which was improperly included in the appendix to accentuate the absence of material detailing the time spent by petitioner's attorneys in prosecuting this workers' compensation claim.

*Super.* at 137–138. See also *Barbarevech, supra,* where we entertained an employer's challenge to a counsel fee of $5,750, which was 11.83% of the $48,600 compensation award. 143 *N. J. Super.* at 33. The case was remanded for further proofs and findings so that we could evaluate appellant's contention that the award was excessive.

The next issue to be considered is the contention that the fees granted to petitioner's three medical experts were inadequate. Each was awarded $50. Conceding that such fees conform to *N. J. S. A.* 34:15–64 when strictly read, appellant argues that the judge of compensation could have allowed a fee of $75 to $100 for the medical examination and report of petitioner's principal witness in addition to the $50 fee for his testimony.

*N. J. S. A.* 34:15–64 provides in pertinent part:

* * * The official conducting any hearing under this chapter may, in his discretion, allow to the party in whose favor **judgment is** entered, costs of witness fees and a reasonable attorney fee, not exceeding twenty per centum (20%) of the judgment; and a reasonable fee not exceeding fifty dollars ($50.00) for any one witness, or one hundred fifty dollars ($150.00) in any one case, for medical witnesses residing in the State when in his judgment the services of an attorney and medical witnesses were necessary for the proper presentation of the case.

The statute does not expressly authorize a separate award for the examination and report of a medical witness, and it clearly limits the award to $50 for each such resident witness. To avoid obvious possibilities for evading the legislative purpose, we must hold that the fee awarded to a resident medical witness cannot exceed $50, inclusive of his services in making an examination and report incidental to testifying. (It would seem reasonable to also apply such limitation to a resident medical expert whose report is used as stipulated testimony.) Petitioner's reliance on *Cerasi v. Cooperson Bros., Inc.,* 123 *N. J. Super.* 524 (App. Div.), certif. den. 63 *N. J.* 566 (1973), and *Carr v. Campbell Soup Co.,* 124 *N. J. Super.* 382 (App. Div. 1973), is mis-

placed. Each case upheld a witness fee in excess of $50 ($200 in *Cerasi* and $100 in *Carr*) awarded to a Pennsylvania doctor who testified for petitioner. However, we said in *Cerasi* that *N. J. S. A.* 34:15–64 "limits fees payable to New Jersey resident medical witnesses, but places no similar limitations on nonresident medical witnesses." 123 *N. J. Super.* at 525. Thus, *Cerasi* lends support for the limitation on the resident medical experts fee which the judge of compensation applied in this case.

We note that *N. J. S. A.* 34:15–64 has not been amended since 1952. Common sense suggests that a fee limitation that was reasonable for those times may be economically unrealistic today. However, this is a matter for the Legislature. The authority of the agency is governed by the existing legislation.

We turn now to the contempt proceedings. The alleged contempts arose out of Bass' persistent reference to counsel fees awarded in other unreported cases despite repeated requests and orders of the judge of compensation to confine his remarks to the case at hand. See *DR* 7–106(A); *In re Ungar*, 160 *N. J. Super.* 322, 330–331 (App. Div. 1978); *Hallinan v. United States*, 182 *F.* 2d 880, 886 (9 Cir. 1950), cert. den. 341 *U. S.* 952, 71 *S. Ct.* 1010, 95 *L. Ed.* 1375 (1951); *Hawk v. Superior Court*, 42 *Cal. App.* 3d 108, 126, 116 *Cal. Rptr.* 713, 725 (Ct. App. 1974), cert. den. 421 *U. S.* 1012, 95 *S. Ct.* 2417, 44 *L. Ed.* 2d 680 (1975); cf. *State v. Stewart*, 162 *N. J. Super.* 96, 103 (App. Div. 1978). However, our disposition on the constitutionality of the right of an administrative officer to adjudicate and punish for contempt makes it unnecessary for us to consider Bass' contention that his conduct did not constitute a contempt.

*N. J. S. A.* 34:15–60 provides in part:

* * * Misconduct on the part of any person attending a hearing, or the failure of any witness, when duly subpoenaed to attend or give

testimony shall be punishable by the director, each deputy director[2] and each of the referees, in the same manner as such failure is punishable by the County Court in a case therein pending.

The history of this section, traced in detail in *DiMarcello v. American Bridge Co.*, 76 *N. J. Super.* 329, 333–335 (App. Div. 1962), certif. den. 38 *N. J.* 498 (1962), makes it clear that in 1939 the Legislature intended to place this limited contempt power in the Bureau of Workmen's Compensation (now the Division of Workers' Compensation, *N. J. S. A.* 34:1A–5.1) in place of the Court of Common Pleas as provided in the statute before its amendment. *Id.* 76 *N. J. Super.* at 335.

In *DiMarcello* no question was raised as to the constitutionality of a statute empowering a nonjudicial officer to adjudicate and punish for contempt. See also *Jersey City v. Bd. of Equalization of Taxes*, 74 *N. J. L.* 753, 756–758 (E. & A. 1907). Clearly, judges of compensation are not judicial officers; they are administrative officers in the Executive Branch of government; and the Division of Workers' Compensation, as it is now called, is not "a court under the new Constitution." *Mulhearn v. Federal Shipbuilding and Dry Dock Co.*, 2 *N. J.* 356, 360 (1949); *Bonafield v. Cahill*, 127 *N. J. Super.* 149 (App. Div. 1974); *DiMarcello v. American Bridge Co.*, supra. Accordingly, appellant contends that it violates the separation of powers doctrine embodied in *N. J. Const.* (1947), Art. III, for a judge of compensation to exercise the power to adjudicate and punish for contempt. For this proposition appellant cited only *Interstate Commerce Comm'n v. Brimson*, 154 *U. S.* 447, 485, 14 *S. Ct.* 1125, 1136, 38 *L. Ed.* 1047, 1060 (1894).[3]

---

[2]In 1960 deputy directors were given the title of judge of compensation. *L.* 1960, c. 58, § 3; *N. J. S. A.* 34:1A–12.3.

[3]The statement in lieu of brief filed by the Attorney General for respondent Second Injury Fund did not address this issue. Therefore, we specifically asked the Attorney General to submit a brief on the constitutionality of this portion of *N. J. S. A.* 34:15–60. See *R.* 2:5–1(h). He promptly complied with our request.

Mr. Justice Harlan's statement in *Interstate Commerce Comm'n v. Brimson,* that "the power to impose fine or imprisonment in order to compel performance of a legal duty imposed by the United States can only be exerted, under the law of the land, by a competent judicial tribunal"[4] has held sway in the federal sphere since 1894. Whether by acceptance of this dictum as controlling authority, or by concurrence in the wisdom of not investing members of the Executive Branch with the power to punish for contempt, that power "has never been put directly into the hands of a federal agency; rather the assistance of a federal court is obtained and its contempt power enlisted in support of the agency" to enforce the agency's subpoena or order. Note, 71 *Harv. L. Rev.* 1541, 1542 (1958). But we need not investigate the federal scene further, since the issue before us is to be decided on the basis of New Jersey constitutional law. We note, however, that the New Jersey legislative pattern has largely paralleled the federal practice. In only rare instances has the New Jersey Legislature given the contempt power to an administrative agency. In addition to the statute in question, there is *N. J. S. A.* 54:2–15, purporting to give the power to the State Board (now Division) of Tax Appeals (soon to be superseded by the Tax Court established by *L.* 1978, *c.* 33; *N. J. S. A.* 2A:3A–1 *et seq.*) ; see also *N. J. S. A.* 30:1–12.1, which seems to give the power to the Commissioner of the Department of Institutions and Agencies in order to enforce his subpoena power.

The predominant mode for compelling the attendance of witnesses, the production of documents and enforcement of other orders of administrative officers and agencies is by resort to the courts and the employment of judicial process. Examples are *N. J. S. A.* 11:1–13 and *N. J. S. A.* 11:1–11

---

[4] With exceptions noted, such as the right of Congress to punish its members for disorderly conduct and to compel attendance of witnesses in impeachment cases, etc. See also *Anderson v. Dunn,* 19 *U. S.* 204, 233–234, 5 *L. Ed.* 242, 249 (1821).

(Civil Service Commission; see *In re Richardson,* 31 *N. J.* 391, 395 (1960)); *N. J. S. A.* 48:2–35 (Board of Public Utility Commissioners); *N. J. S. A.* 18A:6–21 and 22 (Commissioner of Education); *N. J. S. A.* 18A:4–19 (State Board of Education); *N. J. S. A.* 10:5–8(i) and *N. J. S. A.* 10:5–14.1 (the Division on Civil Rights); *N. J. S. A.* 33:1–35 (Division of Alcoholic Beverage Control); *N. J. S. A.* 4:12A–10 and *N. J. S. A.* 4:12A–16 (Milk Control Board and Director of Milk Control); *N. J. S. A.* 52:9M–12(e) (State Commission of Investigation); *N. J. S. A.* 49:3–45 (Bureau of Securities); *N. J. S. A.* 5:8–89 and *N. J. S. A.* 5:8–90 (Amusement Games Control Commissioner); *N. J. S. A.* 5:9–10 (State Lottery Commission); *N. J. S. A.* 34:6–136.16 (Department of Labor and Industry in regard to industrial homework). We note, further, that *L.* 1978, *c.* 67, *N. J. S. A.* 52:14F–1 *et seq.,* which creates full-time administrative judges and the Office of Administrative Law, does not contain any provisions relating to contempts or enforcement of subpoenas in hearings to be conducted by such administrative judges. Presumably, procedures provided by statutes dealing with individual administrative agencies will continue. As indicated above, the existence of the contempt power in the Division of Tax Appeals will be superseded by the assumption of its functions by the Tax Court, established as an inferior court of limited jurisdiction pursuant to *N. J. Const.* (1947), Art. VI, § 1, par. 1; *L.* 1978, *c.* 33, § 1.

▮ The contempt adjudicated here, in the opinion of the judge of compensation, was for conduct occurring in the presence of the *quasi*-judicial tribunal[5] which expressed disrespect for its authority and tended to impede and obstruct the flow of the proceedings. Such a contempt, if committed in a court, may be punished as a petty offense in a summary proceeding, without indictment and trial by jury. *R.* 1:10–1; *State v. Gonzalez,* 134 *N. J. Super.* 472 (App. Div. 1975),

---

5 So termed in *Mulhearn v. Federal Shipbuilding and Dry Dock Co., supra,* 2 *N. J.* at 365.

mod. 69 *N. J.* 397 (1975) ; see *Codispoti v. Pennsylvania,* 418 *U. S.* 506, 513–514, 94 *S. Ct.* 2687, 2691–2692, 41 *L. Ed.* 2d 912, 920 (1974) ; *In re Buehrer,* 50 *N. J.* 501, 513 (1967). The offense is criminal in nature, see *Buehrer* at 517–520, punishable by fine and imprisonment, and is treated as a crime in the ordinary sense in determining the constitutional protections to which an accused is entitled. *Codispoti v. Pennsylvania, supra;* see *Bloom v. Illinois,* 391 *U. S.* 194, 201, 88 *S. Ct.* 1477, 1481, 20 *L. Ed.* 2d 522, 528 (1968).

Article III of the New Jersey Constitution of 1947 expresses the separations of powers doctrine — that one branch of government shall not exercise powers belonging to the other two branches — in the following terms:

> The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.

By reason of this provision our Supreme Court held unconstitutional a statutory scheme designed to empower the Commissioner of Conservation and Economic Development and his assistants, acting as "magistrates," to adjudicate and punish violations of the act regulating power vessels on tidal waters, *N. J. S. A.* 12:7–44 to 53. *State v. Osborn,* 32 *N. J.* 117 (1960). The court said:

> The scheme established for the enforcement of the power vessel acts is inconsistent with the principle of separation of powers, insofar as it vests judicial functions in members of an éxecutive department. The Commissioner of Conservation and Economic Development, whose function is enforcing the acts, and not administering justice, is given the power to designate employees in his Department as "magistrates" to hear and decide cases of alleged violations. These "magistrates" would have loyalty to the Department, and perhaps a natural reluctance to reject evidence brought before them by their own colleagues. Subject to the Civil Service Law, they could be removed by the Commissioner at will, *L.* 1948, *c.* 448, § 3, *N. J. S. A.* 13:1B–3. They are appointed from among those charged with enforcement of the act, and for all that is provided, a magistrate,

sitting today to hear a complaint brought by one of his colleagues, might tomorrow bring a complaint before the same colleague then sitting as a magistrate.

It is unquestioned by the State that the function claimed for these "magistrates" is a judicial, rather than administrative, function. They hear evidence of violations and impose fines, imprison violators for nonpayment of fines, and generally act in the same manner in the conduct of trials as a judge of a court specifically named in *section* 32 of the non-tidal waters act. *N. J. S. A.* 12:7–34.32. The power vessel acts, in their express terms, give the authority to perform these functions only to certain named, regularly established courts, which are free of interference from outside the judicial branch. The Legislature may not constitutionally give these functions also to members of an executive department who are subject to all the influences that the separation of powers principle was established to guard against. [32 *N. J.* at 127–128]

See also, *Atkinson v. Parsekian,* 37 *N. J.* 143, 152 (1962); *cf. David v. Vesta Co.,* 45 *N. J.* 301, 321–328 (1965), where the court found no impermissible exercise of judicial power by the Division on Civil Rights, noting that penal sanctions for violation of orders of the Division "can only be imposed by judicial process" under the statutory scheme, and the Division must use the courts to enforce its orders. At 327–328.[6]

In harmony with the views expressed in *State v. Osborn, supra,* we conclude that the Legislature may not validly grant to an administrative agency or any member of the Executive Branch of government the power to adjudicate and punish contempts of a criminal nature. *Cf. In re Kerrigan,* 33 *N. J. L.* 344, 346 (Sup. Ct. 1869), holding that a municipal recorder, not presiding in a court of record, cannot exercise contempt powers, saying: "To punish by a commitment for contempt is a power belonging only to judges of certain courts, and does not arise from the mere

---

[6]We are not concerned here with the validity of delegating power to an administrative agency to award money damages incidental to its order for other relief, as in *Jackson v. Concord Co.,* 54 *N. J.* 113, 126 (1969) and *Zahorian v. Russell Fitt Real Estate Agency,* 62 *N. J.* 399, 410–416 (1973).

exercise of judicial functions." But *cf. Board of Health v. Weehawken Tp. v. New York Central R. R. Co.,* 10 *N. J.* 284, 291 (1952); *Croasdale v. Court of Quarter Sessions,* 88 *N. J. L.* 506 (Sup. Ct. 1916), aff'd 89 *N. J. L.* 711 (E. & A. 1916).[7] Cases in other states divide on the issue. Accord: *People v. Swena,* 88 *Colo.* 337, 296 *P.* 271 (Sup. Ct. 1931); *Langenberg v. Decker,* 131 *Ind.* 471, 31 *N. E.* 190 (Sup. Ct. 1892); *In re Sims,* 54 *Kan.* 1, 37 *P.* 135 (Sup. Ct. 1894); *Roberts v. Hackney,* 109 *Ky.* 265, 58 *S. W.* 810 (Ct. App. 1900); *cf. Haas v. Jennings,* 120 *Ohio St.* 370, 166 *N. E.* 357 (Sup. Ct. 1929). Contra: *In re Clark,* 65 *Conn.* 17, 31 *A.* 522 (Sup. Ct. Err. 1894); *Dogge v. State,* 21 *Neb.* 272, 31 *N. W.* 929 (Sup. Ct. 1887); *Vogel v. Corporation Comm'n,* 190 *Okl.* 156, 121 *P.* 2d 586 (Sup. Ct. 1942); see *Plunkett v. Hamilton,* 136 *Ga.* 72, 70 *S. E.* 781 (Sup. Ct. 1911); *State ex rel. Morton v. Meyers,* 171 *La.* 313, 131 *So.* 31 (Sup. Ct. 1930); *cf. Ex Parte Patterson,* 110 *Ark.* 94, 161 *S. W.* 173 (Sup. Ct. 1913); *Brown v. Davidson,* 59 *Iowa* 461, 13 *N. W.* 442 (Sup. Ct. 1882).

The view that the validity of administrative contempt powers should be decided on the "rather conceptual constitutional doctrine of separation of powers," rather than on the basis of practical advantages and disadvantages, has been criticized. Note, 35 *Colum. L. Rev.* 578, 579 (1935). It has been suggested that the dictum in the *Brimson* case, *supra,* would not prevail today. Note, 71 *Harv. L. Rev.* 1541, *supra* at 1552. In general, courts have been urged toward a more sympathetic view of administrative contempt powers. *Id.;* Sherwood, "The Enforcement of Administrative Subpoenas," 44 *Colum. L. Rev.* 531, 546–547 (1944); Albertsworth, "Administrative Contempt Powers: A Problem in Technique," 25 *A. B. A. J.* 954 (1939). But Professor Albertsworth suggested only a limited expansion of such powers, observing:

---

[7] These two cases concern only lower courts of limited jurisdiction.

The petty abuses which might result from an incompetent personnel found in the lower officials of government would clearly militate against blanket conference of such wide powers of contempt over the affairs of persons and corporations subject to the veritable host of our present-day administrative agencies. I am not prepared, therefore, to argue for blanket imposition of such power upon all forms of administrative bodies; in fact, I should the rather vigorously oppose it. On the contrary, I do, however, believe that such authority may safely be conferred upon the Interstate Commerce Commission, but restricted to the incipient steps of administration, namely, that of eliciting testimony. Any subsequent steps, such as enforcement of orders of the Commission other than those arising out of the investigatory function, should require the safeguards, if not the checks, of the judicial process in courts of justice. [at 957–958][8]

General knowledge does not tell us that administrative agencies are troubled by contemptuous conduct which cannot be controlled effectively by resort to the courts. See, e. g., In re Richardson, supra. Even in the courts, contempts are often referred to a different judge for prosecution. Only contempts "in the actual presence of a judge," may be adjudicated summarily. R. 1:10–1; In re Buehrer, supra, 50 N. J. at 515. Without consent of the defendant, the trial and punishment of other contempts — contumacy not in the presence of the court and disobedience or resistance to an order or process of the court—cannot be heard by the judge who was offended or whose order was allegedly breached. R. 1:10–2 and 4; In re Buehrer, supra at 515. These rules have been established in recognition of the fact that "the summary power lends itself to arbitrariness." Id. As Mr. Justice White observed in Bloom v. Illinois, supra, 391 U. S. at 202, 88 S. Ct. at 1482, 20 L. Ed. 2d at 529, "Contemptuous conduct, though a public wrong, often strikes at the most vulnerable and human qualities of a judge's temperament." The courts have "long recognized the potential for abuse in exercising the summary power to imprison for contempt * * *." id.

---

[8] General Motors Corp. v. Blair, 129 N. J. Super. 412, 423 (App. Div. 1974), upholds the imposition of sanctions for noncompliance with discovery rules of the Division on Civil Rights. No penal sanction or contempt was involved.

On balance, we perceive no great need to invest non-judicial officers with the power to adjudicate and punish criminal contempts. To reserve this power to the Judicial Branch, pursuant to *N. J. Const.* (1947), *Art.* III, does not unduly restrict the Executive Branch. And, as we have previously observed, this decision is consonant with the statutory scheme affecting almost all other administrative agencies.

We note that the Attorney General agrees that *N. J. S. A.* 34:15–60 cannot constitutionally grant the contempt power to administrative officers. He relies primarily on the holding in *State v. Osborn, supra,* notwithstanding the strong presumption in favor of the validity of all legislation. *New Jersey Sports & Exposition Auth. v. McCrane,* 61 *N. J.* 1, 8 (1972), app. dism. 409 *U. S.* 943, 93 *S. Ct.* 270, 34 *L. Ed.* 2d 215 (1972).

Lest it be thought that our determination leaves a judge of compensation at the mercy of a recalcitrant attorney, we emphasize that our decision is directed only to the incompetency of the administrative tribunal to adjudge the contempt. Here, the Legislature intended that contempts be punished. Statutes dealing with some other agencies may be silent on the subject. We leave for the case in which it is directly presented the question whether, absent statutory machinery, a judicial remedy may be afforded to compel respect for the governmental agency or to punish disrespect or noncompliance with its orders. See *In re Richardson, supra,* where the court's aid was given to cope with a recalcitrant witness, in a proceeding instituted in accordance with statutory authority. 31 *N. J.* at 395.

The judgment below is affirmed as to counsel fees and witness fees. The adjudication and imposition of sentence for the contempts are reversed and vacated for lack of jurisdiction. No costs.